# NEW ORLEANS, JACKSON AND GREAT NORTHERN RAILROAD COMPANY *v.* JIMMY HARRISON.

1. RAILROAD—LIABILITY FOR TORTS OF EMPLOYES.—A railway company is not liable for damages resulting from a willful and malicious trespass committed upon a stranger to the company by its engineer or conductor, outside of and beyond the scope of his authority or line of duty.

2. VOLUNTARY SERVICE—CONTRIBUTORY NEGLIGENCE.—A railway company is not liable for injuries inflicted, through the negligence of its servants, upon a stranger to the company while engaged in the voluntary service of uncoupling its cars, if by his negligence he contributed to the injury complained of.

3. CASE IN JUDGMENT.—H., who was in no way connected with the railway company, was standing at the crossing in Canton, when the engineer or conductor of the train ordered him to go in and uncouple the cars. He refused at first, but in fear of some bodily harm from the railway employé, who had cursed and threatened to beat him if he refused, was forced to perform the service required. After he had uncoupled the cars the train commenced moving, the tender came against his shoulder and knocked him under the cars and the tender wheels ran over his left leg, injuring it so severely that he was compelled to suffer amputation. There was no brakeman on the train. He was not bound to obey the orders under which he acted and could have gotten away had he seen proper. He didn't know he could uncouple the train when he went in, but thought he could. The train was backing at the time. *Held,* that the company was not liable.

ERROR to the circuit court of Madison county. CUNNINGHAM, J.

All the facts necessary to a full understanding of the case will be found in the opinion of the court.

*J. A. P. Campbell* and *Nugent & Yerger*, for plaintiff in error,

Contended, that the conductor or engineer, who put Harrison in fear and compelled him to undertake the perilous task of uncoupling the cars, was liable, civilly and criminally, but that the plaintiff in error was not, because the act complained of was a willful trespass by the servant and beyond his authority, and not sanctioned by the employer; and cited, in support of this view, McCoy v. McKowen, 26 Miss. 487; Middleton v. Fowler, 1 Salk. 282; Craft v. Alison, 4 B. & Ald. 590; Lamb v. Polk, 9 C. & P. 629; Garth v.

Howard, 8 Bing. 451; McManus v. Crickett, 1 East, 106; 2 Roll. Abr. 553; Goodman v. Kennell, 3 C. & P. 167; Smith Mas. and Serv., side page, 160; Story Agency, § 456.

*George Harvey*, for defendant in error,

Contended, that this was a case of a pressing and urgent necessity, and that it would be impossible, in such exigency, to define the extent of the agent's powers. That he must be held to have necessarily possessed large discretionary powers. He was in the employment of the principal and acting, as he doubtless thought, for the best interests of the company. That he did not do an arbitrary, unmeaning thing, but had a proper appreciation of impending danger and acted promptly, without stopping to question his authority to act in the premises. That the proof abundantly shows gross negligence on the part of plaintiff in error, and that Harrison did not contribute to the injury which he sustained. Cited Goddaw v. Grand Trunk Railway, Am. Law Reg.

*R. C. Smith*, on same side,

Filed an elaborately written argument, in which he contended that the instructions given by the court below were not erroneous, and that the verdict of the jury should not be disturbed, and cited the following authorities: 9 Allen, 561; 3 Ohio, 189; 2 Redf. Law Rail. 197; 5 Tiff. 597; 5 Duer, 193; 2 Tiff. 283; 35 N. H. 271; 44 Miss. 466; Shear. & Redf. on Neg., § 11.

Tarbell, J.:

This suit was instituted by Harrison to recover damages from the railroad company for personal injuries caused by the the negligence of the company's servants in running a train of cars. There was a verdict of $600 for the plaintiff in the action. A motion for a new trial was

overruled, and thereupon a writ of error by the railroad company. Exceptions were taken to the instructions given for the plaintiff in the action; to the refusal to give instructions asked on behalf of the company; to the modification of those given, and to the refusal to grant a new trial. The case made by Harrison, who was a witness in his own behalf, was this: That he was standing at the crossing in Canton, waiting for the train to pass; the conductor or engineer, Mr. Pendergrast, ordered him to go and uncouple the train; he refused at first; then the conductor said to him, "G——d d——n you, go in and uncouple the train, or I will hit you with a billet of wood;" he was in fear of some bodily harm from Mr. Pendergrast and was forced to go in and uncouple the cars; after he had uncoupled the cars the train commenced moving; he was standing with his back to the tender and his face to the flat cars; the tender came against his shoulder and knocked him under the cars; the tender wheels ran over his left leg; it was done in 1867; he was then fifteen years old; after he fell off and was hurt, Pendergrast said, "Move him off the track, G——d d——n him, he had no business there;" there was no brakeman on the train when he was injured; he would not have gone in unless he had been ordered and on account of the threat; the engineer did not make any signal or blow his whistle after he uncoupled the cars; he suffered much pain and mental suffering by the loss of his leg; he could have gotten away from Mr. Pendergrast if he had seen proper to do so; he was not bound to obey the orders of Mr. Pendergrast, if he had not seen proper to do so; the train was not stopped good when he went in; he did not know he could uncouple the train when he went in, but thought he would try; the train was backing; there was nothing on the flat cars that he was cutting loose. And this was all the testimony of Harrison.

There was other evidence on the part of plaintiff, but whether the language of Pendergrast was applied to Harrison was not certain. The value of medical attendance and attorney's fees in the prosecution of this suit were also given in evidence. On the part of the company, Pendergrast testified, that he was the engineer and in charge of the train when the accident to Harrison occurred; he says there were four brakemen on the train; that he was coming over the flat cars to uncouple the cars, and not coming fast enough, witness called to him to hurry up; he was wanting to switch off to get out of the way of another train; he did not know that this boy uncoupled the train, and did not know he was in the way until after he was hurt; the tender was loaded with wood, which was piled high and obscured his vision; he did not order Harrison to uncouple the cars; he did not threaten him; the accident occurrred one hundred yards above the street crossing; he had pulled up at the crossing and then passed on; it was sixty-nine yards or steps from the switch to the place of the accident; there was lumber on all the flat cars; the business of witness was to take charge of engines as they arrived in Canton; had a right to hire wipers of machinery and watchmen, but no authority to employ any one outside of that; he had no authority to employ brakemen; it was strictly against orders to order a by-stander to uncouple cars; he had no authority even to order a fireman to uncouple cars; there was no danger of a collision.

Another witness testified that he saw Harrison jump on the train at the freight depot and ride off on the flat car; that boys were in the habit of doing so, and that it was impossible to prevent it.

Other witnesses also testified to the presence of Harrison on the cars and train, from whence he stooped to uncouple the cars, and fell. Several sets of instructions for the plaintiff in the action, differing in material

respects, are given in the record, and it is difficult to determine those submitted to the jury, nor in our view of this case is it essential.

The theory of the prosecution is, that Harrison, standing on the crossing, when the train in charge of Pendergrast hauled up, was ordered, in the absence of brakemen on the train, under threats of violence, to go in and uncouple the cars; that intimidated by these threats, and through fear of bodily harm, obeyed such orders; and while in the act of uncoupling, Pendergrast so carelessly conducted the train as to seriously injure the boy, wherefore this suit was instituted.

On the other hand, the defense presented this view : That the boy was already surreptitiously on the train, without the knowledge of Pendergrast, in charge; that the orders of the latter were to the brakemen, of whom there were four on the train; that the boy, either in obedience to supposed orders, or of his own volition to display his dexterity, or from some other voluntary motion, stooped down to perform the duty of brakeman, when he fell under the cars and was thus injured, without the knowledge, neglect, or carelessness of the conductor, and by his own fault.

The claim of bodily fear is, on the facts, entirely untenable.  The boy was fifteen years of age; he was on the ground, according to his own theory, some distance from the train, and free to fly further; the conductor was upon the train acting in the double capacity of conductor and engineer; to hit the boy, a desertion of the train was necessary; according to the evidence in support of the action, there were on the train no brakemen; and there was haste to switch off to get out of the way of another train.  Under these circumstances, or any circumstances, to suppose the engineer would leave his train to pursue a boy up the street is simply absurd.

The only cases referred to in support of this point,

are 37 Cal. and 9 Allen, where boys surreptitiously obtained seats in the cars for a free ride, and were ejected in so careless a manner as to injure them. The boys being thus on the cars, in the presence and under the power of the conductors, bodily fear was fairly involved. It was held in those cases, that in ejecting the boys from these cars and trains, the conductors were in the line of their duty, and, hence, even bound to act with care and prudence. The dissimilarity is so apparent, comment is not required. The pretense of fear in the case at bar, is without reason and without precedent.

Upon the main question, the adjudications, from consideration of public policy, have gone far in holding common carriers to the fullest responsibility for the acts of their agents towards their passengers under their care. But the case at bar presents a totally different question. Here, accepting the view of the plaintiff in the action, the conductor steps aside from the line of his duty, and in violation of positive instructions, not only orders a stranger from the street to uncouple his train, but accompanies the order with profanity and threats of personal violence in case of refusal. Here is a most gross and wanton interference with the rights of a citizen—one not under his care or control, and no way connected with the company or its concerns; an unauthorized, illegal assault upon a stranger not upon the train, nor meddling with it, but standing at one side and upon the street.

If we accept the theory of the defense, the conductor was ignorant of the presence of the boy on or about the train, and upon the facts the company would not be responsible for the injury he received.

Upon the case made by himself, is the company bound to respond to the claim of Harrison? In view of the rules very positively stated in McCoy v. McKowen, 26 Miss. 487, we answer, clearly not. In the well-considered and

leading case of McManus v. Preckett, 1 East, 106, Lord Kenyon held, " that when a servant quits sight of the object for which he is employed, and without having in view his master's orders, pursues that which his own malice suggests, he no longer acts in pursuance of the authority given him, and his master will not be answerable for such act." Judge Story (Agency, § 456), lays down the same rule, though in somewhat different language ; and, in McCoy v. McKowen, referring to the views of Lord Kenyon and of Judge Story, it is said : " It is immaterial whether or not the tortious act be committed while the agent is engaged in the rightful business of his employer, which he is attending to by his direction ; for if he transcends his authority while so engaged, his acts do not bind his employer unless sanctioned by him." There is no pretense in the case at bar, that the railroad company sanctioned, or has adopted or ratified, the act of the conductor.

The cases cited in support of the action may be briefly referred to with advantage : In 37 Cal. 400, a minor, sixteen years of age, jumped upon a train of cars for the purpose of a free ride. The conductor ejected the boy, but in so careless a manner as to cause him to be injured. It was held by the court, that the conductor could rightfully have prevented the boy from getting upon the cars, and if, in so doing, an injury had befallen the latter, no liability would have attached to the company. But, that after the lad had gained a position on the cars, though the conductor might rightfully put him off, yet he must do so in a careful and prudent manner. The removal of persons from the cars who get thereon wrongfully, was in that case declared to be within the scope of the general authority of the conductor, and that, in ejecting them, he was in the line of his duty.

9 Allen, 557, was similar to that of 37 Cal.

5 Duer, 193, presented only the question of the

liability of a railroad company to a passenger for the willful acts of a conductor.

29 N. Y. 283, involved only questions as to the proper subjects to be considered in estimating damages. Death in that case occurred to a passenger by a collision of trains.

3 Ohio St. 172, was between the railroad company and owners of stock killed while wandering on the track.

Brown v. N. Y. C. R. R., 32 N. Y. 597, was an action to recover for injuries sustained by plaintiff by a collision of defendant's cars with a stage coach, in which plaintiff was a passenger. The accident occurred while the stage was crossing the railroad track where there was a "running switch." *Held,* the making of such a switch over the crossing of the track by a public road, in the populous part of a village, is of itself an act of gross and criminal negligence, and any person who, without negligence on his part, is injured at such crossing, by the act of the running switch, may recover the damages sustained, without other proof of negligence than the act of making such switch.

Southwick v. Estes, 7 Cush. 385, was an action on the case for injury to land. The agents of defendant were engaged in removing stones from the bed of a river to the land of plaintiff, in doing which they sometimes crossed the line of defendant's land, from which they removed stones and soil, though contrary to the directions of defendant. The *nisi prius* judge instructed the jury, "that if the servants of the defendant had done such acts while in his service, and the acts done were within the general course of business and scope of employment in which they were employed by him, and although directed to remove stones or earth within the defendant's southern boundary line, yet, if they were thus employed, negligently passed over the limits thus pointed out by the master, being at the time

employed to remove stones and transport them to the north bank of the stream, and had thus removed stones from the plaintiff's bank, and carried them to the defendant's bank on the opposite side of the river, and there deposited them for a wall or embankment, the master was liable for this action; but that if the acts of the servants were not done negligently, but willfully, and with the intention of disregarding the directions of the master, he would not be responsible therefor." The jury returned a verdict for the plaintiff, and thence the case was taken before the appellate court, where Shaw, C. J., said: " The distinction between the liability of the master for the negligent acts of his servants, and that resulting from their willful and designed tortious acts, appears to have been carefully made and correctly stated in the charge of the judge." 1 East, 106, was cited with approval.

14 How. (U. S.) 468, was a case between a railroad company and a passenger injured by a collision of trains running contrary to orders. The company was held liable.

35 N. H. 271, was an action against the town to recover damages to the plaintiff's horse, carriage and harness, by the insufficiency of a bridge for want of sufficient width and suitable railing. On approaching the bridge on a very dark night, plaintiff heard a carriage approaching from the other direction. He called out to the person approaching to stop, and turned out, as he supposed, so far as was safe and prudent. There was no railing on the east side of the bridge, over which plaintiff's horse backed and was killed, in consequence of a collision with the approaching carriage. The town authorities, who were defendants, asked the court to instruct the jury, that if they believed the plaintiff did not turn to the right and give the approaching carriage one-half the road, and there was abundant room for him to do so, and that the accident happened

in consequence thereof, then the plaintiff cannot recover.

The defendants further requested the court to charge the jury that if they believed that if the plaintiff had given to the approaching team due legal right no accident would have happened, then the defendants would not be liable.

The court declined so to charge, but charged, " that where some accident occurs which ordinary care and prudence could not prevent, and a defect exists in the highway by means of which the damage occurs, and without which it would not have occurred, the town is liable ; that, if the plaintiff's carriage was in the middle of the traveled part of the road, his agent using ordinary care, skill and prudence, considering the circumstances, and came in collision with another carriage, this would be an accident for which the agent of the plaintiff would not be in fault, so far as this case is concerned ; and if such accident led to this damage by a defect in the highway, the town is liable."

The jury returned a verdict for the plaintiff, and this result was sustained in the supreme court on the grounds, viz.: That the plaintiff, at the time of the accident, was exercising all the care and prudence, under the circumstances, of which he was capable ; that though the plaintiff might not have given one-half the road, as required by law, and was thus, himself, a trespasser, yet, that, but for the defects in the bridge, the accident to the plaintiff would not have occurred, and hence the verdict was upheld.

It is urged by the counsel for Harrison, that, after the latter had gone in to uncouple the cars, the conductor knowing he was there on that service, it then devolved on the agent of the company to observe all the care and prudence which the law exacts in such cases. The rule invoked is a sound one, but its application to the facts of this case may well be questioned.

Is not the case at bar as though the conductor had caught the boy with one hand and thus held him under the engine, while with the other he so managed the machinery as to purposely run over the lad and cut off his foot, doing this willfully and maliciously to one not a passenger but a stranger ? If the boy went in through fear, it was equivalent to force, and thus did not the command, the threat, the obedience, the service and the injury constitute one act ? Is the company liable in such a case ? Suppose the boy had attempted to cross the street between the moving cars and had been thus injured ? What would have been the right of the parties in that case ? In reason and according to the precedents, the company, in such case, would not be liable. 1 Allen, 187 ; 2 Red. L. of Railways, 198, note. Where one attempted to pass between cars in motion, propelled by an engine, without any necessity, it was held to be such unequivocal evidence of negligence that the court were justified in charging the jury, as matter of law, that the party could not recover. Ib.

In the case at bar, the train was backing into a switch, and Harrison in his testimony says, it was moving when he went in to uncouple the flat cars from the engine. Accepting his theory of the case, it seems impossible to separate his presence between the cars in the act of uncoupling them, from the threats to which he says he yielded through fear. Upon this hypothesis, the injury was the result of a gross, willful, malicious trespass, upon a stranger to the company, and not a passenger ; an act in violation of orders ; outside the scope of the engineer's duty and authority ; a transaction for which, within the adjudications from the ruling of Lord Kenyon, in McManus v. Crickett, 1 East, 67, to the present time, the company is not responsible. See Smith's Master and Servant, 130 (ed. of 1852), top page, title, " In cases of tort—*civiliter*."

But suppose the service of Harrison to have been

entirely voluntary on his part.   He undertook what, under the most favorable circumstance, is a most dangerous duty, for which servants are specially hired on account of its risk, as few men are willing to be thus employed.   In this case the cars were in motion, and the engineer known to be in haste.   In the estimation of the public generally, Harrison might as well have put his hands in the jaws of a lion, expecting to withdraw them unscratched; descended within the mouth of a volcano, believing he could return in safety; or have entered a magazine with a lighted match without danger, as to have gone, as he says he did, a youth wholly unused to that duty, between the cars of a moving train for the purpose of uncoupling them. Only the most experienced, or those contracting for that special service, would be willing to, or could with any degree of safety, make an attempt involving so much danger — an attempt universally considered hazardous, if not desperate, and declared by the courts to be " extra-hazardous."   With these two propositions, in view of a compliance on the part of Harrison through fear, and of a voluntary service, a few authorities will be referred to as conclusive of the case.

In 37 Cal. and 9 Allen, *supra*, the actions were sustained upon the ground that the conductors, in ejecting from the cars boys who had obtained seats for the purpose of a free ride, were acting in the line of their duty, but performing such duty carelessly, the boys were injured, and the companies were liable.   It was further held, that if the conductors had resisted the boys in their efforts to get upon the trains and they had been thus injured, the companies would not have been liable.   It was said, that the boys having gained seats, they had acquired somewhat the character of passengers ; at least, they could be ejected only in a careful and prudent manner.

Lalor v. C. B. & Q. R. R. Co., 52 Ill. 401, was an

action under a statute of that state by the widow and administratrix of her deceased husband, who was killed while employed about the depot of the railroad company as a common laborer. While so employed, the deceased was ordered by the superintendent or foreman of the company, employed to manage, direct and superintend the business and affairs of the company about the depot, to couple and connect a freight car with the other cars attached to a locomotive, contrary to the special engagement of the deceased, and to do which he was unversed and inexperienced, and while so engaged having to go between the cars for the purpose, the engine was so carelessly managed as to bring the cars together with great force, by means of which he was crushed to death. It was held, that the company was constructively present in the person of the superintendent, whose commands the deceased was bound to obey, and that thus, by the direct command of the company the deceased was exposed to the peril by which he lost his life. The court say: "We place this case on the ground of misconduct of the company in exposing deceased to this peril, and when so exposed, in so carelessly mismanaging the engine as to cause his death." In the case at bar, the engineer was charged only with the transfer and making up of trains, and not with general powers, so that he in no sense represented the company, while Harrison was a stranger. It was held, in 8 Barb. 368, that a railway is not bound in the same degree of care in regard to mere strangers, who may voluntarily, but unlawfully go upon their track, which they owe to passengers conveyed by them. And this distinction is recognized as sound in 2 Red. Laws of Railways, 196. Although not referred to in terms, this distinction is uniformly acted upon, practically, in all the cases between railway companies and their passengers, and between the former and strangers; the modern rule of enforcing the obligation of care and

prudence and skill with rigor, in the one case govern-
ing, while in the other the liability for injuries to foot
passengers, occasioned by a collision with engines or
cars, is the same as that which arises in respect to a
collision between two carriages meeting on the high-
way, or a collision between a foot passenger and a car-
riage.    8 Barb. 380.    And this renders the case at bar
easy of solution.    In the last cases put, both have
rights and duties and obligations of equal grade; "while
engaged in their lawful business, both are bound to use
a degree of caution suited to the exigencies of the
case; the one to avoid occasioning an injury, and the
other to avoid receiving it."    Towards passengers, the
liability of the carrier "spring from a contract, express
or implied, and upheld by an adequate consideration;"
and hence, it is said, "a passenger on board a stage
coach or a railroad car and a person walking on foot
in the street, do not stand in the same relation to the
carrier."    8 Barb. 378.    From this it will be more
clearly seen that the case at bar falls within the class
of cases whereof McManus v. Crickett and McCoy v.
McKowen are embodiments of the doctrines referred to.

The liability or non-liability of the master for the
acts of the servant has been expressed in a great variety
of forms.    Patterson, J., in Lyons v. Martin, 8 Ad. & Ell.
512, says: "A master is liable where his servant causes
injury by doing a lawful act negligently, but not where
he willfully does an illegal one."

Suppose, in the case at bar, that Pendergrast, the
engineer, instead of driving a steam engine, had been
driving a carriage, drawn by horses, and having some
difficulty about the carriage, had, with pistol in
hand, without stopping his team, ordered the boy
Harrison between the wheels of his carriage to ad-
just some of the gearing, and while the boy was
thus between the wheels, suppose he had whipped
up his horses, whereby injuries had resulted to Har-

rison, for which he instituted a suit, what ought
to be the result? While the defendant's servant was
driving a wagon, the son of the plaintiff, a minor, asked
permission to ride. The servant said he might when
he got up the hill; and the boy having caught hold of
the wagon between the fore and hind wheels, the man
started the horses into a trot, and the boy was thrown
down and badly injured. *Held*, that the master was
not liable. 19 Wend. 343; 2 N. Y. 479; Sher. & Red.
72. And thus an answer is furnished to the question
just now propounded.

In those sections where railroads are common through
towns and cities, actions for injuries to persons at the
street crossings are frequent. It is uniformly held
that mutual duties devolve upon the railway companies
and upon the foot passengers. To rush across a street
in front of a moving engine, or between trains, is re-
garded as an act of great rashness and folly. An
attempt of one, wholly inexperienced and unversed in
that work, to uncouple the cars of a moving train,
where the service is. in fact, as it has been judicially.
declared, extra-hazardous, can be considered only as
still more rash and dangerous than to cross a street in
front of a moving engine. It has been repeatedly held
to be the duty of a foot passenger, about to cross a
railroad track, to look up and down the road, to listen
for the cars and to observe all other usual modes of
caution, otherwise the company would be relieved from
responsibility in case of accident. In view of these and
other adjudications herein referred to, it seems to us
very clear that the plaintiff in this action is not entitled
to recover, even upon the case which he has made for
himself. Sher. & Red. ch. 5; ib. 296, § 266; ib. 548,
§ 488 and notes; ib., § 489; etc.

We rest the decision of this case upon several
grounds: If Harrison's theory of the facts be correct,
then it was a willful, malicious trespass by the engineer,

outside of and beyond the scope of his authority and of his line of duty, not upon a passenger· on the train, but a stranger to the company, and, therefore,· the latter is not liable.

·If uncoupling the cars was voluntary by Harrison, it was an act of most extraordinary rashness and folly, and one which contributed directly to the injury. It is not the degree of his carelessness, however, which exonerates the company, but the question to be determined is, whether his negligence contributed to the injury of which he complains. It is enough to defeat him if the injury might have been avoided by his exercise of ordinary care. And this rule is based upon grounds of public policy, which require, in the interests of the whole community, that every one shall take such care of himself as can reasonably be expected of him. 8 Barb. 368; 27 ib. 534, 227; Sher. & Red. 33, *et seq.*; 2 Bosw. 374; 52 Ill. 326, etc.

In Hartfield v. Roper, 21 Wend. 619, the late Mr. Justice Cowen said : When an infant " complains of wrong to himself, the defendant has a right to insist ·that he should not have been the heedless instrument of his own injury. He cannot, more than any other, make a profit of his own wrong. *Volenti non fit injuria.*" And in Brown v. Maxwell, 6 Hill, 592, it is broadly declared, that " a plaintiff suing for negligence must himself be without fault." This is doubtless correct, as a general rule, but it is not necessary to indorse its sweeping terms as applicable to all cases of a plaintiff suing for negligence, nor even to the case at bar, for in this instance the reckless disregard of prudence by the· plaintiff in the action far surpasses any and all the precedents which have fallen under our observation. 2 Red. L. of Railw. 191, ch. 24, § 2; Sher. & ·Red. ch. 3; ib. ch. 5, and cases in notes.

*Judgment reversed and cause remanded.*