JOHN HOLLER, PLAINTIFF AND DEFENDANT IN ERROR, v. P. SANFORD ROSS, INCORPORATED, DEFENDANT AND PLAINTIFF IN ERROR.

Submitted July 8, 1902—Decided November 17, 1902.

1. The servant of the master cannot bind the master to respond in damages to the plaintiff unless it be shown that the act which the servant did, which caused the injury, was an act which was, expressly or by necessary implication, within the line of his duty under his employment.
2. The master is not responsible if the wrong done by the servant is done without his authority, and not for the purpose of executing his orders or doing his work.
3. A person employed to watch the personal property of a company, stored upon the real property of another, will not be deemed to be acting within the line of his duty, if he shall shoot a person trespassing upon the realty, because that person refuses to go off the premises, or to halt or to throw up his hands, at his command.
4. Where it appears, when the plaintiff rests, that the act of the servant was a willful one and was not expressly or impliedly within the line of the servant's duty or employment, there should be a nonsuit.

On error to the Hudson Circuit Court.

On the night of January 16th, 1900, the plaintiff was shot in the face and back by the servant of the defendant. One of the results of the shooting was the loss of the plaintiff's eye.

The defendant was the owner of certain personal property stored upon a wharf, called by the witness a dock, which is situate upon the Jersey side of the Hudson river, near Fort

Lee. The shooting occurred at about six o'clock in the evening. It was dark.

The defendant did not own the wharf, and its personal property was only upon a part of the property. The servant was employed to watch the property of the defendant upon the wharf, to take care of it and see that it was not stolen.

On the day of the shooting, prior to the time of shooting, three men had been to the wharf and been driven away by the defendant's servant. The men, as the plaintiff's case shows, had threatened to return and kill the defendant's servant. That same night the plaintiff, with two other men, came to the wharf in a boat and tied it and climbed up the crib work upon it, and began to move around upon the filled work at the river front and back upon other parts of the property. The defendant's servant saw them, and surmised they were, or might be, the same three men who had been there before on that day in a boat and who had threatened to kill him. He armed himself with a shotgun, which he had upon the premises to shoot game, but which gun was not his master's, nor had it been furnished by his master, nor was the gun brought to the premises with his master's consent or knowledge. The servant testified for the plaintiff that he had used the gun to kill game in the daytime and had, at times, carried it at night. The servant further testified, in the plaintiff's case, on the plaintiff's examination, as follows:

"*Q.* For what purpose was it—protection or what—that you fired?

"*A.* I was the man to know their business on that dock during that hour in the night.

"*Q.* For whom did you want to know that?

"*A.* For myself; nobody else."

The evidence of the person who owned the property, who was called by the plaintiff, was that the defendant was "merely allowed to use the dock property for storage, up to such time as I might rent the property or make use of it."

Adolph Aspen, one of the men who was upon the wharf with the plaintiff, testified for the plaintiff:

"*Q.* When he called, 'Hands up,' you three fellows all started to run?

"*A.* Yes, sir; I wasn't going to stand there like a monkey; I was scared, of course; I had four children and a wife home."

It further appeared on direct examination in the plaintiff's case, in the testimony of the servant, Anderson, as follows:

"*Q.* Tell us what happened, and what you saw, and what you done?

"*A.* Before I spoke to them, I told them to hold up their hands and stop, and I told them to stop two or three times, but they did not—they did not stop; when one of them answered me, he says, 'Which way do you want me to run?' I says, 'Don't run at all;' I says, '*Go on the dock and stand still, so I can see who you are;*' I called to them again—I called to them about four times before I shot; then I fired right straight over their heads.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"*Q.* How many barrels?

"*A.* Only one the first time; then I called to them three or four times again *and I went after them* and I shot again.

"*Q.* What did you do that for?

"*A.* I wanted them men to halt."

Again this witness said:

"*Q.* You told them to throw up their hands and stop—what did they do?

"*A.* Commenced to run."

The plaintiff also testified that he, with his companions, were upon the wharf to get some wood to heat coffee, and were there only seven or eight minutes before he was shot. Plaintiff was at all times quite a distance from, if not at the time of the shooting, running away from the defendant's servant.

For the plaintiff in error, *Bedle, Edwards & Lawrence.*

For the defendant in error, *Young & Arrowsmith.*

The opinion of the court was delivered by

FORT, J. There is but one question in this case, viz., is the defendant liable for the injuries done to the plaintiff by its servant, under the facts set out at the head of this opinion?

In an action of tort, in the nature of an action on the case, Judge Hoar says the rule is that "the master is not responsible if the wrong done by the servant is done without his authority, and not for the purpose of executing his orders or doing his work." *Howe* v. *Newmarch,* 12 *Allen* 49, 57.

The servant in this case was not employed to protect the wharf, but the personal property of the defendant upon a part thereof. The wharf itself did not belong to the defendant. A person employed to watch the personal property of a company stored upon the real property of another will not be deemed to be acting within the line of his duty if he shall shoot a person trespassing upon the realty, because that person refuses to go off the premises or to halt or throw up his hands upon his command. If the person shot had the personal property or some of it in his possession and refused to surrender it, or if he was in the act of taking it and refused to desist when commanded so to do, and he was shot by the servant, even though the shooting were wanton and willful, the master might nevertheless be liable. But that is not this case. There is no proof in this case that the plaintiff, or those with him, were interfering in any way with the property of the defendant. They were simply upon the wharf to boil some coffee, and the servant of the defendant, without excuse or explanation, while they were engaged in gathering wood for this purpose, or while they were in the act of running away, shot and injured the plaintiff. It is difficult to see how such shooting can in any way be distinguished from the shooting by any stranger who might have happened to be on the wharf and tried to drive the men therefrom. There is no proof in the record that it was any part of the duty of the defendant's servant to keep persons off the wharf. In fact, the implication is entirely the other way. He was to watch the personal property of the defendant stored upon the wharf

to see that it was not taken away by persons who might come thereon for any lawful or other purpose.

Even where a watchman is given by the master a revolver to use in guarding property, it is held in *Golden* v. *Newbrand* (52 *Iowa* 59), 35 *Am. Rep.* 257, that the master is not liable for injuries caused to a person who has been upon the property, but who is, at the time the shot is fired, off the property and fleeing away. In that case the court said: "To protect the brewery did not require Roenspeiss to shoot and kill a person who was retreating therefrom. The killing was not, therefore, done in the line of the duty Roenspeiss was employed to perform."

"It is immaterial whether or not the tortious act be committed while the agent is engaged in the rightful business of his employer, which he is attending to by his direction; for if he transcends his authority while so engaged, his acts do not bind his employer unless sanctioned by him." *New Orleans, &c., Railroad Co.* v. *Harrison* (48 *Miss.* 112), 12 *Am. Rep.* 356.

The case at bar is not within the class of cases where the master is required by contract to protect the person assaulted by his servant, as in the case of passengers assaulted by railway employes. *Dillingham* v. *Russell* (73 *Texas* 47), 15 *Am. Rep.* 953 (see *note*); *Ware* v. *B. & L. Canal Co.*, 35 *Am. Dec.* 189 (*note* 201).

The plaintiff and his companions were clearly technical trespassers upon the wharf property; neither he nor they had any contract or other legal relations with the defendant or indeed with the wharf-owner.

The Supreme Court of Connecticut states the rule applicable to this class of cases about as clearly as it can be done, when it says:

"For all acts done by a servant in obedience to the express orders or direction of the master, or in the execution of the master's business, within the scope of his employment, and for acts in any sense warranted by the express or implied authority conferred upon him, considering the nature of the service required, the instructions given and the circumstances

under which the act is done, the master is responsible; for acts which are not within these conditions, the servant alone is responsible." *Stone* v. *Hill*, 45 *Conn.* 47.

For a complete review of all the cases in this country upon the general subject of the master's liability or non-liability for the acts of his servant in cases of tort, see the note to *Goodloe* v. *Memphis, &c., Railroad Co.*, 54 *Am. St. Rep.* 67, 71, 85.

The servant of the master cannot bind the master to respond in damages to the plaintiff unless it be shown that the act which the servant did, which caused the injury, was an act which was expressly, or by necessary implication, within the line of his duty under his employment.

When the plaintiff rested, the proof, as I think, left no room for doubt that the act of the servant was neither within the express nor implied duty imposed upon him by the fact or nature of his employment. The plaintiff was bound by the evidence of Anderson, Aspen and Ross, offered by him, which established the fact that the servant of the defendant was not at the time of the shooting doing an act which was necessary or which he could possibly have believed to be necessary to protect his master's property, but was engaged in a willful and wanton trespass outside the line of his duty.

Anderson testified that he fired the shot "to know for himself" why the men were on the wharf at that hour of the night. He was not employed for that. It was not in the line of his duty to shoot at men to learn that fact. It is quite apparent, of course, that the shooting in this case could in no sense be considered a negligent act. It was clearly willful. It was an act of the servant intentionally done. It was as wrongful as it was willful. It can hardly be characterized as less than malicious. It was evidently inspired by a feeling of personal resentment to punish the three men, because he thought they were the persons who had threatened to kill him on the afternoon of the same day.

Under the early English authorities, beginning with Lord Kenyon's judgment in *McManus* v. *Crickett*, 1 *East* 106, for such an act as that done by this defendant's servant the

master was not liable. The early cases made the test of the master's liability depend upon the moral quality of the act, instead of leaving it to depend upon the question of whether the act was done in the line of the master's business and within the scope of the servant's employment. This was not only true in England, but in this country. *Moore* v. *Sanborne,* 2 *Mich.* 519; *Wright* v. *Wilcox,* 32 *Am. Dec.* 507 (*note*); *Cox* v. *Keahcy,* 36 *Ala.* 340; *Hughes* v. *New York and New Haven Railroad Co.,* 36 *N. Y. Supr. Ct.* 222; *Yerger* v. *Warren,* 31 *Pa. St.* 319; *Passenger Railway Co.* v. *Donohue,* 70 *Id.* 119; *Crocker* v. *New London Railroad Co:,* 24 *Conn.* 249; *Brasher* v. *Kennedy,* 10 *B. Mon.* 30; *Harriss* v. *Mabry,* 1 *Ired.* 240.

It will not be necessary to cite the cases which show that this rule is no longer followed in England or this country. Any text-book on "Master and Servant" will give them, and show the gradual growth away from the doctrine of McManus *v.* Crickett; but a careful study of the cases will demonstrate that the reason for the change in the rule has generally been supported upon principles arising out of the contract character of the relation, between the master and the person injured, under which the willful act has been committed. The rule has been gradually extended, until it may be said that the liability of the master for the willful, wrongful and malicious acts of the servant now extends to every case where the act of the servant is done with a view to the furtherance and discharge of his master's business and within the scope and limits of his employment. *Mott* v. *Consumers Ice Co.,* 73 *N. Y.* 543; *Rounds* v. *Delaware, Lackawanna and Western Railroad Co.,* 64 *Id.* 129; 20 *Am. & Eng. Encycl. L.* (2d ed.) 169.

Beyond the scope of his employment the servant is as much a stranger to the master as any third person, and his act in that case cannot be regarded as the act of the master. *Sm. Mast. & S.* (4th Eng. ed.) 299.

The rule, as it is now established by the later judicial declarations, should be held strictly within its defined limits. It

is a rule capable of great abuse and much hardship, and the courts should guard against its extension or misapplication.

For a willful act done by a servant not within the line of his employment, and about which there is not a doubtful question of fact as to whether the act of the servant was or was not within the line of his duty, the court should control the case and nonsuit or direct a verdict for the defendant. Whether there be evidence which raises a question to go to the jury as to whether the act of the servant was within the line of his duty and employment is for the court. If the court so determines, then it is a question for the jury whether, under the proof, the act was or was not within the line of the servant's duty or employment.

Where it appears, when the plaintiff rests his case, that the act of the servant was a willful one, and was not, expressly or impliedly, within the line of the servant's duty or employment, there should be a nonsuit.

When the plaintiff rested his case the defendant moved to nonsuit, "because there is no testimony in this case which would, if true, operate to bind the defendant, P. Sanford Ross, incorporated." A careful examination of the plaintiff's proof makes it clear that such was the fact. The shooting by the servant of the defendant was not, under the proof made by the plaintiff, shown to have been done while the servant was acting within the line of his duty or employment, and a nonsuit should have been granted. Its refusal was error, and for this cause the judgment should be reversed.

*For affirmance*—PITNEY. 1.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, VAN SYCKEL, DIXON, COLLINS, FORT, GARRETSON, HENDRICKSON, BOGERT, ADAMS, VREDENBURGH, VOORHEES, VROOM. 13.