DALLAS CONSOL. ELECTRIC ST. RY. CO.
v. GILMORE.

(Court of Civil Appeals of Texas. Dallas.
June 3, 1911. Rehearing Denied
June 24, 1911.)

1. CARRIERS (§§ 280, 283*)—CARRIAGE OF PERSONS—CARE REQUIRED BY THE CARRIER.

A carrier of passengers, while not an insurer, is bound to exercise the highest degree of care and prudence for the safety of his passengers, and he must not only protect them against the violence and insults of others, but against the violence and insults of his own servants.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1087, 1121–1123; Dec. Dig. §§ 280, 283.*]

2. CARRIERS (§ 282*)—CARRIAGE OF PERSONS—DUTY OF CARRIER—ASSAULT BY EMPLOYÉ.

Where those in charge of a car ejected a negro therefrom because he was in the part reserved for white people, and, after ejecting, wantonly assaulted him, the carrier is liable, though the negro were a trespasser.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1107–1116; Dec. Dig. § 282.*]

Appeal from Dallas County Court; W. M. Holland, Judge.

Action by J. A. Gilmore against the Dallas Consolidated Electric Street Railway Company. There was a judgment for plaintiff in the justice court, and defendant appealed to the county court where judgment was again rendered for plaintiff, and from that judgment, defendant appeals. Affirmed.

Walter H. Walne, Spence, Knight, Baker & Harris, and Baker, Botts, Parker & Garwood, for appellant. D. M. Mason, for appellee.

TALBOT, J. The appellee, a negro, brought this suit against the appellant to recover damages on account of being ejected from one of appellant's cars, and for personal injuries received by him through an assault committed upon him by a conductor of the appellant. The suit was instituted in the justice court and from a judgment rendered in that court by default in favor of the plaintiff for the sum of $200, the case was appealed to the county court. The petition alleges that the plaintiff was a passenger on one of defendant's cars in the city of Dallas; that while such passenger, the defendant's conductor and motorman, in charge of said car, without cause or provocation, ejected plaintiff from the car and struck him on the head with an iron bar, took his ticket from him and refused to allow him to ride on the car. The defendant answered by general demurrer, a general denial and specially that plaintiff was at no time a passenger on defendant's car; that the plaintiff took the seat in a part of the car designated for the white race, and that at no time was he accepted as a passenger by defendant's conductor; that whatever assault defendant's conductor may have made

upon the plaintiff the same was made after plaintiff was off the car and on the ground. The case was tried in the county court before a jury, and resulted in a verdict and judgment for the plaintiff in the sum of $100, and the defendant appealed.

The material testimony, so far as is necessary to state, is as follows: Plaintiff testified that he boarded the San Jacinto car of the defendant, with a transfer from the conductor on another car to go home; that the car was a summer or open car with seats running across it from one side to the other; that he took a seat on the second seat from the back or rear end of the car because the first seat from the back end was filled with colored people; that at the time he boarded the car the conductor was busy somewhere up in the front end of the car; that the seat he occupied was the only one he could get unless he went up in front where the white people were; that after he took his seat the conductor of the car came and took up his transfer and said nothing to him then, but that after he went to the front of the car and collected fares he returned and says, "Old man, you will have to crawl out of here," and he (plaintiff) said: "Why is it I can't ride in here?" that the conductor replied, "Well, you can't ride in here; you will have to either get out of this seat or get out of the car"; that he (plaintiff) refused to get out of the car; that the conductor then stopped the car and he still kept his seat; that the motorman then came to him and said: "Old man you will have to crawl out of that seat," and that he asked "Why," and the motorman simply said: "You can't ride there"; that he (plaintiff) then said, "Gentlemen, you all can put me off of the car if you want to, but I will not voluntarily get up and get off the car, and neither will I get up and go to the back end of the car"; that the conductor and motorman, assisted by a passenger, then put him off the car, and, in effect, that, in so doing they did not handle him roughly but used sufficient force to get him off. Plaintiff further testified that he had a little pocket knife in his hand cleaning his finger nails when he was ejected; that the motorman told him to put his knife up and he said, "No, sir; it is my knife, and I don't see why I should put it up"; that the conductor then came up behind him with a long iron switch bar and struck him with it; that he did not resist being removed from the car, and that at the time he took his seat in the car he did not notice any other occupant of that seat, but that after he was put off the car he noticed that a white man was occupying the seat with him. As to his knowledge of the cause of his ejection, plaintiff said: "They have not told me yet why they wanted me to leave that seat. As to whether I have ever found out why they wanted me

to leave that seat I will say this: I don't know that I have ever found it out, but I am going to say that when they did mention that I was trying to ride with white folks, I think they wanted me to get away from there because I was on the seat with a white man, but they did not say that when they told me to get off. But the conductor did say that I was trying to ride with white passengers, when the motorman asked me why I did not pay my fare and ride like a gentleman, then the conductor said: 'He paid his fare, but he is trying to ride with white folks.'" Plaintiff further testified: "After they pulled me off of the car I did not try to get back on at the same place, but I attempted to get back and get my transfer. I asked permission to let me get my transfer, and the motorman said, 'Here, take it,' and I was going to ask permission to ride on it. I did tell the motorman that I would not shut up my knife, and told him I was not after him with it. I did not try to get on that seat any more, but I was going to get back on the car if they would let me anywhere I could. I asked their permission to get back up and get my transfer, and I had my hand on the pulley that you pull back on the car with, and that is the time I got hit. None of them struck me when they pulled me off; they just got hold of me and pulled me off of the car. I was struck after I was put off, while I had my hand on the pulley. They did not curse me. But they snatched me off of the car and assaulted me after they got me off. The lick was right up in the edge of my hair, over the right eye. The motorman had his crank in his hand when he came back to take me off of the car, and had it in his hands when the conductor hit me, and had it in his hand when he spoke to me about the knife. I never had a fight in my life, and I did not try to fight the motorman or the conductor, and while the motorman was armed with a heavy crank, I would not have thought of fighting him with a penknife in my hand, even if I had wanted to fight." He further said that he was familiar with the board markers separating the races on one side of which was written "For Whites," and on the other, "For Negroes"; that he did not know whether he was in front of or behind the board marker when he was ejected. O. W. Youngblood testified: "I was conductor on the car at the time the trouble came up that this suit is about. The car was an open summer car. The back seat was full of colored passengers, and there were two white men on the next seat to that one, and the race sign was up, and this plaintiff crawled right over the two white men, and sat down in the middle, and there were colored people standing on the back end of the car and white people standing on the front end of the car, but the back end was full of colored people. My intention was to find an open space first up in front and move the two white men to it. They were on the second seat from the rear where plaintiff was then seated. I collected fares back to where the two white men and this plaintiff were seated—just these three on that seat. The car was full in front of the plaintiff, mostly all ladies. When I got back to where plaintiff was, he had a transfer which he handed me from Oak Cliff, and I took the transfer, and said, 'You will have to move back. This is for white people and you can't ride in here." He said, 'I am going to ride right here.' I said, 'This is not up to me; there is a law against it, and we can't let you negroes and the white people ride together and you will have to move back.' He said, 'I am not going to move back,' and I just reached up and pulled the bell cord and stopped the car at Orange street and then I said, 'You will either get off or move back.' He said, 'I will not do either because I have a transfer and am going to ride right here where I am.' The car was still standing and I went up to the front and got the motorman, Briley, and brought him back there, and he helped me get the plaintiff off. But before he was gotten off I got up in the space behind him and I said again, 'You will have to get off or go back'; and he said, 'I will do neither, and you can't make me.' I just got hold of him and gave him a pull, and the motorman was on the ground and he got hold, and both of us together gave him a shove. When the plaintiff got on the ground he got a little further off than you are, and pulled out his knife and opened it, and I stepped back on the running board and the plaintiff started back and the motorman got hold of him, and the motorman had his controller in his hand, and the motorman told plaintiff to shut up that knife, and plaintiff said he was going to ride in that car and in that seat, and he (the motorman) said, 'If you want to ride you can ride back here, but you are not going to ride with that white man.' I looked at him and said, 'You put that knife up, and come here where you belong,' and he said, 'I am going to ride on that car where I was'—and I got off the running board and hit him with the bar, and as he ran off I hit him again. The switch rod that I struck plaintiff with I got from the back end of the car. At the time I struck plaintiff with the switch rod I think he did not see me, as I was back of him, and just as I hit him he wheeled around and ran, and he was talking to the motorman when I hit him, and of course he was not trying to assault me at that time. I had to get off of the car to go and get that switch rod. He was facing the car, and the motorman was hold of him. He and the motorman had their faces towards each other, standing side by side, and they were both about the same distance from me. I did not tell him I was going to hit him. I hit him once, and when he ran I hit him again. I hit him about as hard as

I could, but I did not have a good swing."

[1] The assignments of error and propositions thereunder need not be discussed in detail. In the view we take of the case it becomes unnecessary to a proper disposition of the appeal to determine the interesting question, whether or not a negro, who takes a seat in the compartment of a street car designated in compliance with the law of this state for the white race, becomes a passenger. If it should be conceded that he would not, yet, under the facts of this case we think the judgment of the lower court should be affirmed. The law is well settled that the carrier is obliged to protect his passenger from violence and insult. He is not an insurer of his passenger's safety against every possible source of danger, but he is bound to exercise for their safe transportation that high degree of care and prudence that very cautious and prudent persons would exercise under the circumstances of the situation. He must not only protect his passenger against the violence and insults of strangers and copassengers, but, a fortiori, against the violence and insults of his own servants.

[2] It also seems to be well settled that if a trespasser is assaulted by an agent of the carrier who has authority to eject him, the carrier is liable for the act of such agent. In the well-considered case of Railway Company v. Baird, 130 Ala. 334, 30 South. 456, 54 L. R. A. 752, 89 Am. St. Rep. 43, it is said: "There appears to be some divergence of opinion as to a common carrier's liability for an assault, and the like, committed by its agent upon a passenger when the agent is acting beyond the scope of his employment in the usual acceptation of that phrase. Of course, the law is well settled that for torts committed by such agents or employés upon persons who are not passengers the employer is not liable, unless the act was in a sense in the line of duty imposed by the employment, as where a conductor of a train, being under a duty to the railway company, and having authority to eject persons not entitled to carriage, commits out of his own malice and personal ill will towards such a person an unnecessary assault upon him in ejecting him from the train, the wrongful act, though against the express rules and regulations of the carrier, is yet within the scope of the conductor's employment, and the company would be liable in damages for it. But the reverse would be true—the company would not be 'liable—if such conductor should assault a person standing by the side of the train, for instance, and having no relations with the carrier, nor in any way encroaching upon the rights of the carrier; for in this latter case the wrongful act of the conductor would have no connection with his duties to the company, and would be entirely beyond the scope of his employment. Such is the law as between trespassers and strangers generally on the one hand and the carrier on the other." We approve the doctrine here announced and treating, for the purposes of this appeal, the plaintiff, in taking his seat in that portion of the car from which he was ejected, as a trespasser and admitting that his ejection therefrom was authorized, we hold that the finding of the jury, to the effect that more force was used to prevent appellee from again boarding the car than was necessary, and that, therefore, an unlawful and unjustifiable assault, after his ejection, was committed upon him by defendant's servant, was justified. We think appellant's employés had the right to use reasonable force to prevent the appellee from getting back into the compartment of the car set apart to the white race, but did not have the right to use unreasonable or unnecessary force to accomplish that purpose. As shown the plaintiff testified that he did not try to get back on the seat from which he had been removed, and, in effect, that he was going to get back anywhere on the car that the conductor would allow, and that while he was in the act of doing so the conductor struck him a violent blow with an iron switch rod. This act was in the line of duty imposed upon the conductor by his employment, and for the consequences of which the defendant was liable under the rule announced in the case of Railway Company v. Baird, supra. As is well said in that case, where a conductor being under a duty to the railway company, and having authority to eject persons not entitled to carriage, commits out of his own malice and personal ill will towards such a person an unnecessary assault upon him in ejecting him from the train, the wrongful act, though against the express rules and regulations of the carrier, is yet within the scope of the conductor's employment, and the company would be liable in damages for it. That the conductor in the present case had authority to eject persons not entitled to carriage from defendant's car and to prevent them from riding thereon is not questioned, and it follows that in striking the plaintiff, whether he did so with a view of preventing him from again boarding the defendant's car or from malice or personal ill will towards him, he was acting under a duty to defendant, and within the scope of his employment. This being true, the defendant is liable to plaintiff for the damages he sustained by reason of such assault.

The court's charge in submitting the case to the jury presents no such error as requires a reversal of the case.

The judgment is therefore affirmed.