GRUBB v. GALVESTON, H. & S. A. RY. CO.

(Court of Civil Appeals of Texas. San Antonio. Jan. 15, 1913. Rehearing Denied Feb. 12, 1913.)

1. APPEAL AND ERROR (§ 927*) — DIRECTED VERDICT—EVIDENCE.

For the purposes of an appeal from a judgment on a directed verdict for defendant, the plaintiff's evidence must be taken as true.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2912, 2917, 3748, 3758, 4024; Dec. Dig. § 927.*]

2. RAILROADS (§ 274*) — "TRESPASSER" — INTENTION TO DEFRAUD.

A person standing on a railroad platform waiting for a chance to steal a ride on a train, being there for the purpose of defrauding the railroad company, in violation of Pen. Code 1911, art. 1531, was a "trespasser."

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 868–872; Dec. Dig. § 274.*

For other definitions, see Words and Phrases, vol. 8, p. 7094.]

3. RAILROADS (§ 281*)—INJURY TO TRESPASSER AT STATION.

That plaintiff was a trespasser at a station at which he was waiting to steal a ride on a freight train did not justify a train guard on a passenger train in shooting at him.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 902–909; Dec. Dig. § 281.*]

4. RAILROADS (§ 281*)—ACTS OF EMPLOYÉS— INJURY TO TRESPASSER—LIABILITY OF RAILROAD COMPANY.

Where a train guard, not authorized to interfere with trespassers, wantonly and willfully, and without any reference to his master's business, shoots a mere trespasser, who is not attempting to interfere with the train or anything on it, or to then do anything unlawful, the railroad company employing the guard is not liable.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 902–909; Dec. Dig. § 281.*]

5. MASTER AND SERVANT (§ 300*)—INJURY TO THIRD PERSON BY SERVANT—LIABILITY OF MASTER.

While the doctrine that the master is liable for damages to third parties from the wrongful acts of his servants within the course of their employment and scope of their authority, express or implied, should be rigidly construed and upheld, it should not be so construed as to destroy the rights of the master.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1209; Dec. Dig. § 300.*]

6. MASTER AND SERVANT (§ 304*) — NEGLIGENCE OF SERVANT—LIABILITY OF MASTER.

The master is responsible to third persons for the negligent acts or omissions of his servants in the course of their employment, though unauthorized or absolutely forbidden by him, and without regard to their motives.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1226–1228; Dec. Dig. § 304.*]

7. RAILROADS (§ 281*)—ACTS OF EMPLOYÉS— SCOPE OF EMPLOYMENT.

That the person who shot plaintiff while a trespasser at a station was on duty as a train guard at the time did not render the railroad company liable for the unlawful use of the pistol, which was in his possession by virtue of his employment.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 902–909; Dec. Dig. § 281.*]

Appeal from District Court, Bexar County; Claude V. Birkhead, Judge.

Action by W. J. Grubb against the Galveston, Harrisburg & San Antonio Railway Company. From judgment for defendant on directed verdict, plaintiff appeals. Affirmed.

J. R. Norton and James Routledge, both of San Antonio, for appellant. Baker, Botts, Parker & Garwood, of Houston, Templeton, Brooks, Napier & Ogden and W. F. Ezell, all of San Antonio, for appellee.

FLY, C. J. This is a suit for damages arising from a wound inflicted by a train guard upon appellant, which was instituted by appellant, a minor, by his next friend, against appellee. It was alleged that appellant and another person were standing at appellee's depot in Glidden, Tex., while a passenger train of appellee was standing at said depot, and as the train moved away from the station in an easterly direction an agent, who had been placed by appellee on the train to prevent robbery of it, fired a pistol and shot appellant in the leg. The cause was tried by jury, and a verdict for the appellee was instructed by the court, and, upon the verdict returned in compliance with the instruction, the judgment was rendered from which this appeal has been perfected. The only question is, Was there any evidence upon which the cause should have been submitted? If there was, the judgment should be reversed; but, if not, it should be affirmed. This requires close consideration of all the evidence for appellant.

On May 30, 1911, appellant and Richmond Nelms, his companion, rode in a box car over the railway line of appellee from San Antonio to Glidden, Tex. They rode in the box car without the consent of appellee. They arrived at Glidden about 8 p. m. and lingered about the station until about 2:30 a. m. of May 31st, when the regular passenger train en route from San Antonio to Houston arrived. Appellant stated that he and his companion were merely waiting at Glidden for another freight train on which to steal a further ride to Houston. He claimed to have spent his stay in Glidden in eating and talking to Jim Kearns, an employé of appellee. When the passenger train came in, appellant and Nelms walked from the lunchroom of the station, which is on the

south side of the track, which, of course, runs east and west, and walked to a point near a pile of sand, called a "bumper" by appellant, at the end of a spur or side track, and stood there facing the train. They were 15 or 20 steps west of the depot. They were standing at that point when the train came in, directly south of the vestibule of two cars, which were sleeping coaches, and remained there the whole time the train was in Glidden, which was about five minutes. Appellant gave this account of the shooting:

"At the time the train came in, my back was to this bumper, as I call it. I was facing the train. I was facing north; and after I arrived at this bumper it wasn't but a minute or so before the passenger train which I spoke of came into the yard and came up to the depot; it wasn't very long. When the train arrived, I didn't do anything; never moved at all; remained in the same position. With reference to what part of the train stopped opposite where I was standing with reference to the head end, why, mostly to the rear, two or three coaches. We were immediately opposite the vestibule or platform where two of the cars join together. There was some one on the platform, and this person looked at us very hard. The train remained at the station a short time; I don't know exactly how long; and during that time the person that was on the platform was in the same position all the time. Yes, sir; I looked at that person on the platform; he was on the rear platform of the car, nearest to the west. After the train had stood there, it pulled away from the depot, and at the time it pulled away I didn't do anything. I kept my eye on the man that was watching me. I never moved from the position occupied by me. As the train pulled out, the man did nothing. As that train pulled out, I was standing in the same position as I was when the train pulled in. I noticed this man looking very peculiarly at me, and I followed him up with my eyesight as the train pulled out. When he got a certain distance up in front of the depot, the flash of a pistol came from him, and I was shot. The train had moved about 30 steps, with reference to the position where it was standing at the time it started, at the time I was shot." He identified the man who shot him as Sisk, who was employed by appellee as a guard to protect the passenger trains from thieves, who were in the habit of stealing the personal property of passengers through the windows, when trains were stopped at stations and water tanks.

Appellant testified that the platform was lighted, so that all the movements of himself and companion could be plainly seen by Sisk. He stated: "The light was shining around there, so there was no trouble for him to see; no trouble for him to see what we were doing; that we were just simply standing there. We were doing nothing at all, except rolling a cigarette; both of us were rolling a smoke, I think; I don't know whether it was lit or not; standing there rolling a cigarette, Nelms and I both; that is all we were doing. From the time we stopped there at that box or bumping post up until the shot was fired, all we did was simply to stand there and look at this fellow and roll a cigarette. * * * When the train started to pull out, neither Nelms nor myself started out towards the train. * * * After the train had pulled a little ways up, I saw him motion with his arm, and the flash of the gun; just his arm move, and saw a flash. He raised his arm from his side; I don't know whether he got it in his pocket or not; raised it from his side. He did not have a pistol in his hand when standing there in front of us. That train moved 25 or 30 yards, I guess, yards or steps, about a car and a half length, before I saw a motion with his hands." He stated that the man had passed the station, and was east of it, when he fired the shot, and swore: "I kept my eye on him from the time the train stopped until he fired the shot. I could see he was shooting directly at me. I could see he was watching me all the time from the time the train stopped until he fired the shot. I kept my eyes on him, and he kept his eyes on me, all the time from the time the train stopped until the shot was fired." He reiterated that the place was well lighted, and that he was perfectly visible to anybody about the place.

Nelms, the only witness who corroborated appellant's statements as to the shooting, contradicted him in several material particulars. He swore that Sisk was east of where they were standing; that they passed him as they went along the train; that he alighted from the train after they reached the place where they stopped; and that he stood there and stared at them, and when the train started got on again. He stated the train had moved far enough for the rear end of it to be opposite them before the shot was fired.

The case of appellant rested on his testimony and that of Nelms. The other testimony tended to contradict all of their statements.

[1-3] Sisk swore that he was on the train to prevent the depredations of thieves; that he had no knowledge of any one having been shot at Glidden until some time afterward; that he opened the door of the vestibule on the north side of the car opposite the station, and looked out to protect the cars from thieves; that he was not on the south side of the car, and did not open the vestibule door on that side; that he saw no one but a negro; that he heard a shot fired on the north side of the train; and that he did not fire it. He stated that he had his pistol in his hand while standing on the steps of the vestibule on account of the presence of the negro, who, he thought, might wish to enter a car; that no theft from a train ever oc-

curred on the side next to a station, but always on the opposite side, and consequently that was the only side he watched. Lovelady, an engineer, testified that he was riding as a passenger in the cab of the engine on the night of the shooting; that he saw the flash and heard the report of a shot, just as the train pulled out of Glidden, on the north side of the train. All of the employés on the train contradicted every material statement made by appellant and Nelms, and the testimony strongly preponderated against the truth of their statement. Their testimony is also surrounded with an atmosphere of improbability. However, for purposes of this appeal, it must be taken as true, in view of an instructed verdict; and, while they were clearly trespassers on the property, because avowedly there to defraud the appellee and commit a crime (article 1531, Rev. Crim. Stats. 1911), still, as they were not attempting to commit it at the time, the guard was not justified in shooting at them. Articles 112 and 113, Crim. Stats.

[4] The testimony does not present any issue as to the shot having been fired to prevent any illegal attempt to take or injure property in the possession of appellee; for, if the testimony of appellant and Nelms be true, they were doing nothing at the time the shot was fired to indicate any purpose whatever to take or injure any property, but were absolutely doing nothing but rolling cigarettes. There was nothing in their action to indicate to any one that they intended to attack or board the train at the time the shot was fired, because they were perfectly still, making no movement toward the train, which had passed them, and they could not, if they had desired, have committed any depredations upon it. The shot was consequently fired with wantonness, with an utter disregard of human life and a profound contempt for the laws of the state. It sprung from a condition of mind that showed a heart regardless of social duty and fatally bent upon mischief, which is the essence of that malice which is back of every murder. It cannot be said that the act was committed to protect the property of appellant, because no attack was being made or indicated at the time. It cannot be said that the pistol was fired to frighten appellant and his companion and cause them to desist from intended boarding of the train, because appellant removes all chance of any such hypothesis by his testimony. He swore that they did not intend to attempt to board the passenger train; that they were in full view of Sisk; that they were standing still; that the pistol was aimed directly at him; and that it was fired after the train had passed them, and they could not have boarded it if they had so desired. There is not one word of proof in the case tending to show that appellant was accidentally and negligently shot, but all of it tends to show that it was in-

tentionally and maliciously done, and, further than that, indicates that Sisk had stepped aside from any business intrusted to him by appellee, and was endeavoring to wantonly kill or injure an innocent man standing on the platform. This from the standpoint of the evidence of appellant, and from that alone, and which, however improbable, must be taken as true for the purposes of this appeal.

[5] It is an old rule, thoroughly established by precedent, that the master is liable for damages to third persons caused by the wrongful acts of his servants, done within the course of their employment and the scope of their authority. The liability arises, not only from the mere negligence of servants, but also from their willful acts, though unauthorized or even forbidden by the master. The doctrine of respondeat superior is undoubtedly a harsh one in many instances; but it is firmly imbedded in our laws and system of jurisprudence, and cannot be questioned, or its application evaded, not only on account of its antiquity, being a heritage from the Roman law, but also because it is absolutely essential to the preservation of life and human rights amid the intricacies and problems of the complex system of modern business, where individuality has been swallowed up in corporations, whose responsibility for their wrongs could not be fixed, save through the method of making them liable for the wrongful acts and omissions of their servants. The abrogation or substantial impairment of the rule would place the rights of the citizen in a constant state of menace at the hands of irresponsible and merciless corporations, behind which cruel and unscrupulous men would shelter themselves from responsibility. Enough is done along this line, in spite of all the safeguards of legislation; and not one of the laws on the subject should be weakened or impaired by a too liberal judicial construction. Yet the other side of the question must be calmly and impartially considered, and neither the doctrine of respondeat superior, nor any other principle governing masters and servants, so amplified and extended as to perpetrate wrong or work oppression upon the master. The rule should be rigidly construed and upheld in all cases, but should not be allowed to escape its bounds, so as to invade and, perchance, destroy the rights of the master.

[6] Under the wise application of the rule herein set forth, it is held that the master is not only responsible for any act of the servant performed at his express command, but he will be also held liable for such act under an implied authority. As before stated, the master is responsible for the negligent acts or omissions of his servants in the course of their employment, though unauthorized or absolutely forbidden by him, and without regard to their motives. Quinn v. Power, 87

N. Y. 535, 41 Am. Rep. 392; Reinke v. Bentley, 90 Wis. 457, 63 N. W. 1055.

The rule is thus stated in the case of Railway v. Anderson, 82 Tex. 520, 17 S. W. 1040, 27 Am. St. Rep. 902: "To hold the master liable for the act of his servant, it is not necessary that the servant should have the authority to do the particular act. The act of the servant may be contrary to his express orders, and yet the master may be liable. But the act must be done within the scope of the general authority of the servant. It must be done in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed. For the mode in which the servant performs the duty he is engaged to perform, if wrongful and to the injury of another, the master is liable, although he may have expressly forbidden the particular act."

In the case of Railway v. Cooper, 88 Tex. 607, 32 S. W. 517, Willie Cooper, a boy, was on the tender of the locomotive with the engineer and fireman, and, as a joke, the end of a water hose, connected with the boiler, was inserted in the hip pocket of the boy and the water turned on, and being hot scalded and injured him seriously and permanently. The court held: "It is true that circumstances might have required the discharge of hot water from the boiler by means of the appliances used in this instance, but upon this occasion the evidence shows that the act done was not for the purpose of discharging a duty, but simply as one of sport and mischief on their part towards the injured party. The distinction lies in this: That if the discharge of the hot water was one authorized to be done by the servants, and was at the time being done in the discharge of their duty as such servants, then the master would be responsible for the consequences to the plaintiff, although the servants might, in the discharge of their duty, maliciously or mischievously have thrown the water upon plaintiff. It cannot be said that the act of putting the water upon the plaintiff must have been authorized, because such act would never be authorized by a master; but it is the act itself of discharging the hot water that must have been done in the course of the employment of the servant, and for the purpose of forwarding the business of the master. It does not matter that the servant might have used the same appliances in the discharge of a duty to the master, but the question definitely and distinctly presented is, Was the servant in the particular case in the discharge of such duty? And, as before said, if thus in discharge of a duty, the manner of its performance, if wrongful, whether that it be negligently done, maliciously, or in sport, does not affect the question of liability."

So in this case Sisk, having been employed to guard the trains of appellee and prevent the depredations of thieves upon its passengers, may have been empowered to carry a pistol, and even to use it in protecting the property; but, unless he was in the prosecution of that work, or the furtherance of the design of the master, or believed he was, at the time of the discharge of the pistol, appellee cannot be held liable. It certainly cannot be said that the act of discharging the pistol was done in the course of the employment of Sisk and to forward the business of appellee; and it does not matter that he might, under some circumstances, have used the pistol in the discharge of a duty to the master. What duty owed by him to appellee was he performing? He was not repelling an attack upon its property; nor could any attack be inferred or anticipated by him. There was no act committed by appellant and Nelms upon which to base a surmise or suspicion that they contemplated boarding or molesting the train or any other property of appellee. On the other hand, the shot was fired when it was impossible for appellant to board or otherwise molest the train. It was moving, and had passed him, when the shot was fired, and he was making no effort to reach it, but was standing perfectly still.

The facts of this case clearly distinguish it from that class of cases where the servant acted in the prosecution of his master's business and within the scope of his authority, but acted negligently, or even willfully and intentionally. Thus, in the case of Lipscomb v. Railway, 95 Tex. 5, 64 S. W. 923, 55 L. R. A. 869, 93 Am. St. Rep. 804, a servant was employed to protect the station of the railroad company, which had been entered several times and goods stolen therefrom, and an employé, in the prosecution of his lawful business, went to the station in the night, and finding it locked went to a window and made a noise, which awakened the guard, who, thinking he was a burglar, fired upon him and killed him. It is clear that the guard was engaged in the prosecution of the work for which he had been employed, and the court said: "In the present case Gatlin's instruction was to watch the station and catch burglars. This necessarily involved the exercise of the discrimination necessary in distinguishing burglars from innocent persons, and in making the arrest and determining the degree of force called for by the circumstances. If, through want of proper care, he mistook Lipscomb for a burglar and used a degree of force not justified by the situation, his act may justly be deemed a negligent exercise of the authority derived from the master." Suppose, in that case, other employés had been about the station in the prosecution of their labors, and Lipscomb, while standing quietly at a distance from the station in a light which made every movement discernible, had been shot down by the guard, it is apparent that a totally different case would have been presented. The guard,

under those circumstances, would not have been engaged in the exercise of the authority conferred upon him by the master.

In the case of Railway v. Crutcher, 141 S. W. 137, which is cited by appellant, it appeared that the conductor on a train found a trolley wire hanging in such a position across the railway track as he thought would interfere with the passage of his train, and it became his duty to remove it, and while he was so engaged he frightened a horse the plaintiff, a woman, was driving, and, in turn, so frightened the woman as to injure her. It was uncontradicted that it was the duty of the conductor to remove any obstruction from the track that might interfere with the movement of the train; and, while he may have erred in believing the wire an obstruction, or in his manner of removing it, still he was acting within the scope of his employment and in furtherance of the master's work.

In the case of Railway v. Parsons, 109 S. W. 240, cited by appellant, a guard was employed by the railway company to protect its property in its shops and yards at a terminus of one of its lines. Some persons, among the number Parsons, had entered a freight car belonging to the railway company, had placed sand on the floor of the car, and built a fire thereon. Employés of the company endeavored to get the trespassers to leave the car, but failed in the effort, and then the guard was sent for by the yardmaster, and he undertook to put the trespassers out of the yard. While they were being marched by the guard out of the yards, he fired upon and wounded Parsons. The court held that the injury was inflicted by the guard while in discharge of his master's business.

We need not go further in distinguishing cases cited by appellant from the one before us. They are clearly distinguishable. But in the end each case must rest and be determined upon its peculiar facts and circumstances, as no two cases ever will be exactly like each other, and other cases can only be employed as a guide to the proper solution of the instant problem of the application of the law to the facts. And in this case the facts clearly distinguish it from any of the cases cited by appellant. Appellant had done nothing to indicate that he had any unlawful act in contemplation; he had done nothing to call for action on the part of the guard. He intended, at some future hour, to invade appellee's rights of property by getting on a freight train; but the guard did not know it. Appellant was not acting in a way to arouse suspicion, as he alleged and proved. He was doing what any innocent person could be doing, and had the right to do. From the viewpoint of the guard, he was doing nothing unlawful, and did not contemplate doing anything unlawful, so far as the guard knew and had any grounds for imagining. The fact that he and his companion were standing on the platform at 2:30 o'clock in the morning could not have arous-ed suspicion, because they were in the full glare of the light, and, as alleged by appellant, "many persons congregated upon said depot grounds at the time of the arrival and departure of all its passenger trains, both day and night, with the full knowledge and consent of the defendant company."

[7] It cannot be reasonably contended that, because Sisk was upon duty as a guard at the time of the shooting, the appellee was responsible for any unlawful use of the pistol that he was in possession of by virtue of his employment. This is forcibly illustrated in the case of Railway v. Currie, 100 Tex. 136, 96 S. W. 1073, 10 L. R. A. (N. S.) 367, where Nicholls, an employé of the railway company, was engaged in directing compressed air upon a fire to extinguish it, and, as a joke, turned the air upon the rear of Currie, and caused his death by perforating and lacerating his intestines. The Supreme Court held: "His act was a clear departure, for the time, from that service, and the quickness with which it was done cannot be made the test. If the turning aside from the master's business be only for an instant, so that it be complete, the authorities agree that there is no liability on his part for the servant's act." That case clearly sustains the judgment in this case, and so do the following cases: Electric St. Ry. Co. v. Gilmore, 138 S. W. 1134; Holler v. Ross, 68 N. J. Law, 324, 53 Atl. 472, 59 L. R. A. 943, 96 Am. St. Rep. 546; Candiff v. Railway, 42 La. Ann. 477, 7 South. 601; Turley v. Railroad, 70 N. H. 348, 47 Atl. 261.

The language used in the cited case of Holler v. Ross, by the Court of Errors and Appeals of New Jersey, is peculiarly appropriate to the facts of this case, as the facts in that case are stronger against the defendant than those in this case. In that case, on a dark night, a man employed by the defendant to guard certain personal property stored on a wharf, and prevent any one from stealing it, saw three men land from a boat on the wharf, and called to them to throw up their hands. They did not do either, and the guard fired on them twice and injured one of them. The New Jersey court said: "There is no proof in the record that it was any part of the duty of the defendant's servant to keep persons off the wharf. In fact, the implication is entirely the other way. He was to watch the personal property of the defendant, stored upon the wharf, to see that it was not taken away by persons who might come thereon for any lawful or other purpose." So in this case Sisk was employed to guard the train on which he was riding, and the property of passengers thereon; he had no authority to interfere with persons standing on platforms at stations, even though he knew them to be trespassers. He was not protecting the train when the shot was fired, but, if he fired the pistol, did so wantonly and willfully, and without any reference to the master's business. If appellant

had been making any effort to interfere with the train or anything in it, or had shown any intention to so do, the master might be liable, even though the shooting was wanton and willful; but there is no testimony tending in the least to show that appellant and Nelms were interfering with appellee's property, or contemplated any such interference.

The judgment is affirmed.