BAKER et al. v. IVES. (No. 618.)

(Court of Civil Appeals of Texas. El Paso. Oct. 19, 1916.)

1. RAILROADS ⊸281(5)—ASSAULT BY SERVANT—LIABILITY.

A watchman whose duty it was to look out for and arrest trespassers and thieves in railroad yards, having through want of proper care or exercise of proper discrimination mistaken for a depredator an innocent traveler, having a right to go through the yards, and assaulted him, was acting within the scope of his employment, rendering his employer liable.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 908; Dec. Dig. ⊸281(5).]

2. ASSAULT AND BATTERY ⊸40—DAMAGES—EXCESSIVE VERDICT.

Though no serious permanent injury was inflicted, a brutal and unprovoked assault having been committed on one rightfully traveling through railroad yards, he having been fired on, and clubbed into insensibility, his person searched and the contents of his pockets removed, and this accompanied by violent and abusive language, and he on being released being ordered

⊸For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

in a most insulting and humiliating manner to leave the yards, a verdict for $1,000 damages cannot be held excessive.

[Ed. Note.—For other cases, see Assault and Battery, Cent. Dig. § 55; Dec. Dig. ⚖➝40.]

Appeal from Anderson County Court; E. V. Swift, Judge.

Action by W. A. Ives against Jas. A. Baker and another, receivers. Judgment for plaintiff, and defendants appeal. Affirmed.

Morris & Sims, of Palestine, for appellants. Funderburk & Strickland, of Palestine, for appellee.

HIGGINS, J. This was a suit by appellee for damages for personal injuries sustained as the result of an assault. The action was against the appellants, as receivers of the International & Great Northern Railway Company. Plaintiff alleged: That a part of the railroad property of said company operated and held by the defendants as receivers, consisted of railroad yards, extending from the depot in Palestine westward about one-fourth of a mile to a street crossing, which yards were covered with switches and tracks, there being usually and ordinarily numerous trains and cars thereon. That the nearest and most convenient way for pedestrians to pass from and to points near said depot, or in going to or coming from points at and near the west end of said railroad yards, is and was on or about said 7th day of December, 1914, to pass along and between said railroad tracks, and at said time and since long prior thereto, the defendants, in their operation of said railroad, and with full knowledge of the fact and custom, had permitted such travel through said yards along said tracks and at least gave implied consent for plaintiff and the public generally to so use said ways. That defendants, for the protection of the property of said railroad company and property in their custody and control, from loss and injury by trespassers and thieves, had, at said aforementioned date and since prior thereto, in their employ, one Tom Grace, as guard and watchman, whose duty it was, as agent and employé of defendants, to police said railroad yards, grounds, and property, to eject trespassers therefrom, and arrest thieves and depredators operating in said yards. That on or about said 7th day of December, 1914, plaintiff, in the early evening of said day, started to his home, about a mile or a little more out near the west line of said railroad and, as had been his custom for nearly two months prior thereto, went by the freight depot, and thence westward through said railroad yards hereinbefore described. That soon after he had passed the east end of said freight depot, he was halted and arrested by the said Tom Grace and called upon by him to answer questions and account for his presence at said place, his destination, etc. That the said Tom Grace, without cause or just provoca-

tion, thereupon committed an assault upon plaintiff by the display and discharge of a pistol, and by striking, beating, bruising, and wounding plaintiff with a pistol or some other heavy instrument, knocking plaintiff into temporary unconsciousness. That he searched the person of plaintiff, taking such things as he could find, which, however, he returned. That, resulting from said blows, plaintiff received personal injuries. That the said Grace, in inflicting upon plaintiff such injuries, did so willfully and wantonly and in total disregard of plaintiff's rights of personal security. That the said Grace, in so doing, professed to be so doing in the discharge of the duties of his employment, and at any rate, was acting within the general scope of his employment. The defendants denied that any guard or watchman assaulted the plaintiff, but contended if he did, that he was not acting within the scope nor within the apparent scope of his employment, and if he committed any assault, it was without the scope of his employment; wherefore, the defendants were not liable. Plaintiff recovered judgment for the sum sued for, and defendants appeal.

[1] Error is first assigned to the refusal of a peremptory instruction in favor of the defendants, it being contended that such charge should have been given, because it appears from plaintiff's own testimony that if he was assaulted by the defendants' night watchman, Grace, he was assaulted at a time and place where he had a legal right to be; that from the evidence, he was neither trespassing, depredating, or stealing anything and therefore, if the watchman, Grace, did strike him, as he alleges, without provocation, the defendants are not liable, because such action of Grace was clearly without the scope of his employment and authority, and without the apparent scope of his employment and authority, as he was employed for the purpose of removing trespassers, arresting thieves, and preventing depredators from operating in said yards, all of which plaintiff was not.

H. A. Watts, chief special agent of defendants, by whom the watchman, Grace, was employed, testified as follows:

"I instructed Mr. Grace at the time of his employment to watch out for these merchandise cars never making an arrest of anybody unless he actually caught him in the act. I also instructed him that the main line, south, west, and north had become a public thoroughfare from long usage and to let travelers pass along there, but any one he caught meddling and depredating to put them out. * * * He (meaning Grace) had no authority whatever to stop or question any one passing along through the yards in the regular way; that was against instructions."

"I employed him the 11th day of November, 1914, as night watchman, Palestine yard, because so many cars were being broken open and robbed and burglarized and goods carried away, and it was necessary on account of depredations. * * * Yes; I have heard of several cases of people asking the railroad employés for matches at night and trying to get their watches or rob them; that is a favorite way and an old

way. Yes, it was left to Mr. Grace's judgment on the instructions I had given him to decide whether a man was out of the way or a suspicious looking character or not."

G. Escott, witness for appellee, testified:

"I have been night watchman for the International & Great Northern Railroad Company. To the best of my recollection, I worked for the company for 5 years as night watchman. I served also as day watchman 15 or 16 years; quite a long time. * * * Yes; I am familiar with the duties as night watchman. * * * If the night watchman saw any suspicious men around, it was his duty to put them out. * * * As I understood it, the watchman was the only man that was to determine whether a man was a suspicious looking man or not. He was the only man down there to pass on it."

Richard Comer, witness for appellee, testified:

"I am a cousin to Mr. Ives. I was with him the 7th of December, 1914. I got with him that night at the oil mill. I left the oil mill with him about 7 o'clock. * * * We passed by the corner of depot that evening and saw Mr. Grace and Mr. Crady at the end of the depot. * * * I asked them for a match. Mr. Grace gave me one. Yes, Mr. Grace, that man right there. At the same time, the other man looked down into my face. From there we went on up the track. * * * We had gone three or four car lengths when Mr. Grace and Mr. Crady hallowed to us to wait and we kind of slowed down. * * * Thought it was some of the boys wanted to go with us, and they came up there, and one of them he hauled off and shot down between us, and then asked my cousin where he was going, and he said home, and he asked him which way did he live, and my cousin said out on Cartmell's place, and then he hit him in the head with a gun. * * * When he knocked him down, he searched him and Mr. Crady held the stuff while Mr. Grace did the searching. Mr. Grace searched me and took off of me some little change. I don't just know what they did take off us. Took Ives' watch and took my pocketbook. I had $2 or $3. I don't know exactly. Then they gave everything back to us. Asked my cousin what was going to do then and my cousin told him was going to the doctor's office and have his head dressed, and then Mr. Grace asked Mr. Crady what would (we) do with them, and I don't know what Mr. Crady said, but then he told my cousin after he had gotten on his feet, told us to get on down the road. He (Grace) said his business was a railroad something. I don't remember what; a special something. I don't remember what his words were."

W. A. Ives, appellee, testified:

"I started honke, came out by Schuh's meat market, got some meat, then went on up Front street there to the First National Bank. I reckon it is, right on the corner across the depot and bought some hot tomales; * * * then we went on up to the street that leads out across there by the freight office. East of the freight office, we saw two men sitting there. Richard Comer was with me. * * * We passed the men there. Mr. Crady was talking to another man. It was that man there. They were Mr. Grace and Mr. Crady. They were leaning up against that coal bin. Comer asked them for a match. I don't know which one gave him the match, but we had gone on about three car lengths up the track, west track, when Mr. Grace and Mr. Crady stopped us and wanted to know where we was going. They walked up and said, 'Boys, where are you going?' I said, 'Going home.' He said, 'Where do you live?' I said, 'Down the track about a mile.' He brung out an oath and said, 'What do you call down the track about a mile, * * * and where do you live?' I said, 'Down the railroad track about a mile.' He took out his searchlight and

sized me up, and then he took out his gun and shot and hit me. He shot the ground right between me and Comer, and then hit me with the gun, * * * and when I regained consciousness * * * he said, 'What are you going to do now?' * * * I said, 'I am going to the doctor's office and get my head tied up.' * * * So they marched us on down to the crossing, and then sort of turned off to the roundhouse."

We think the testimony quoted clearly sufficient to raise an issue as to the liability of appellants for the act of Grace in committing an assault upon the appellee. Railway Company v. Anderson, 82 Tex. 516, 17 S. W. 1039, 27 Am. St. Rep. 902; Lipscomb v. Railway Company, 95 Tex. 5, 64 S. W. 923, 55 L. R. A. 869, 93 Am. St. Rep. 804; Railway Company v. Parsons, 109 S. W. 240. In the case first cited, a brakeman had forcibly ejected the plaintiff from a moving freight train, causing him to fall beneath the wheels, whereby he was seriously injured. The suit was for damages caused by this act. The brakeman was not authorized to eject plaintiff, although it might have been said that it was done in the interest of the master. In discussing the liability of the master in that case, Chief Justice Gaines said:

"To hold the master liable for the act of his servant, it is not necessary that the servant should have authority to do the particular act. The act of the servant may be contrary to his express orders, and yet the master may be liable. But the act must be done within the scope of the general authority of the servant. It must be done in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed. For the mode in which the servant performs the duty he is engaged to perform, if wrongful and to the injury of another, the master is liable, although he may have expressly forbidden the particular act."

In the case of Lipscomb v. Railway Company, supra, Lipscomb was shot at the station of the railroad company at Rice, about 5 o'clock in the morning by one Gatlin, who had been stationed in the building by the agent of the railroad company to keep watch for and catch burglars. The station had been entered several times, and goods in the possession of the express company had been stolen, and Moore, the agent, for several nights before the killing of Lipscomb had kept watch in the station until 12 or 1 o'clock, and had caused Gatlin and one West to arm themselves and guard the station for the remainder of the night. His only instructions to them were to catch the burglars. Lipscomb and Davenport were the engineer and fireman, respectively, upon a freight train of the railroad company which was traveling northward through Rice to Ennis. At a point south of Rice, the boiler became so impaired as to render it impracticable to carry the train through, and, upon telegraphic orders from headquarters at Ennis, those in charge of it left the cars composing the train at one of the stations and proceeded northward with only the engine and caboose. When Rice was reached, the boiler had failed so that it was impossible to carry it fur-

ther, and the engine and caboose were carried past the station and backed into the switch north of it. The engineer and fireman then went together to the station to report the condition and get orders, which, according to some of the evidence, was in line of their duty. Finding the doors of the waiting room locked, they went to the window and made a noise which awakened Gatlin, who, with West, was asleep in the room, and he, mistaking them for burglars, fired his gun at Lipscomb whom he saw at the window, and inflicted the wounds from which he died.

The Court of Civil Appeals (62 S. W. 954) held that the shooting of Lipscomb was the willful and intentional act of Gatlin, and therefore the railroad company was not responsible for it. Justice Williams, in overruling this holding of the Court of Civil Appeals, used this language:

"The statute making such company responsible for the negligence of its servants at once brings into consideration the relation of master and servant and some part, at least, of the common law governing that relation. The master or principal is made responsible for the negligence of the servant or agent—that is, for negligence of the latter happening while they are acting in such capacity. The rule of respondeat superior, to some extent at least, is thus imported by the statute into such cases. As it is established by the better authorities and enforced in this court, that rule does not make the responsibility of the master depend on the question whether an injury inflicted by the servant was willful and intentional or unintentional, but upon the question whether the servant, when he did the wrong, acted in the prosecution of the master's business and within the scope of his authority, or had stepped aside from that business and done an individual wrong. Railway v. Cooper, [88] Tex. 610 [32 S. W. 517], and authorities there cited; Haehl v. Wabash, etc., Ry., 119 Mo. 325 [24 S. W. 737]. There is much authority, however, for the proposition that, under the common law, the master is not liable for the malicious and intentional torts of the servant, although committed while engaged in forwarding the master's business; and it is by no means clear that the rule of respondeat superior as first stated is made to apply in its full force in actions given by our statute for injuries resulting in death. Assuming for the purposes of this case that it does not, and that a killing by a servant which is willful and not negligent is not within the statute, it is still true that if the killing in question can be regarded as a negligent one, there is a case for the determination of the jury under the statute. The servant acts for the master in executing instructions or rendering service. If he does this without the exercise of due care, he is guilty of negligence. The act which he does may be intentional, but if it is done without the observance of precautions necessary to a due execution of his instructions or exercise of his authority, this absence of care makes his act a negligent one. In the present case, Gatlin's instruction was to watch the station and catch burglars. This necessarily involved the exercise of the discrimination necessary in distinguishing burglars from innocent persons, and in making the arrest and determining the degree of force called for by the circumstances. If, through want of proper care, he mistook Lipscomb for a burglar and used a degree of force not justified by the situation, his act may justly be deemed a negligent exercise of the authority derived from his master. This view is sustained by both classes of authorities just referred to. McManus v. Crickett, 1 East, 67; Croft v. Alison, 4 Barn. & Ald.

590. In the latter case, the doctrine is thus stated: 'If a servant driving a carriage in order to effect some purpose of his own, wantonly strike the horses of another person and produce the accident, the master will not be liable. But if, in order to perform his master's orders, he strikes but injudiciously and in order to extricate himself from a difficulty, that will be negligent and careless conduct for which the master will be liable, being an act done in pursuance of the servant's employment.' In that case, the act of the servant in striking the horses was intentional, but, as it was 'injudiciously' done, it was held that it was also a negligent performance of his duty as servant. It seems to us that this brings the case of a shooting by a servant, which was intentionally done because of mistake resulting from want of proper care in carrying out the master's orders, within the word 'negligence' used in the statute. The act is negligent because it is a careless performance of the duty of the servant. We are therefore of the opinion that the Court of Civil Appeals took an erroneous view of this question."

Under these authorities, we think it clear that the trial court properly submitted the issue of liability of appellants for the act of Grace in making the assault upon appellee. If, in fact, the appellee had been a thief or depredator upon the property of the appellants, or if his conduct had been such as to lead Grace reasonably to believe that he was such, the latter would certainly have been acting within the scope of his employment if he used all reasonable and proper means to protect the company's property. He was undoubtedly charged by appellants with the authority, and it was his duty to exercise the discrimination necessary to distinguish between burglars, thieves, depredators, and innocent persons, and to make arrests when called for by the circumstances, and to determine the degree of force necessary to be exercised. If, through want of proper care or the exercise of the proper discrimination, he mistook appellee for a depredator or person who otherwise should be dealt with in the manner in which he did deal with him, he was certainly acting within the apparent scope of his employment, and the appellants must be held liable for any want of proper discrimination or improper conduct of his in that respect.

The burden of appellants' assignment seems to be that as the duty of Grace was to look out for and arrest trespassers and thieves, he, as a matter of law, did not subject his employers to liability for the assault made by him on appellee, since appellee was neither trespasser nor thief. This position, logically, would simply mean that the master would not be liable for any act of an employé unless it was within the scope of his actual authority. Appellants rely upon the case of Grubbs v. Railway Company, 153 S. W. 694. It will serve no good purpose to discuss this case at length, and it is sufficient to say that it is clearly distinguishable because in that case the act of the train guard in shooting and injuring the plaintiff, according to the plaintiff's own testimony, was willfully, wantonly, and intentionally done without any fact or circumstance justifying such conduct

under his employment to the railroad company.

The second assignment complains of the refusal of a special instruction which reads:

"If you believe from the evidence that at the time and place of the alleged assault, the plaintiff was traveling a public thoroughfare leading through defendants' yards, and if you further believe that plaintiff was not further molesting defendants' property, and if you further believe that watchman Grace had no authority to interfere with persons traveling said highway through said yards, then if he did assault the plaintiff, he was not acting within the scope of his employment, then you should answer special issue No. 2, 'No.'"

This charge we think was properly refused, because, as is pointed out above in cases cited, actual authority for Grace to interfere with persons traveling through the yards was not necessary in order to render appellants liable.

[2] It is next assigned as error that the verdict and judgment of $1,000 is excessive. It is true no serious, permanent injury was inflicted upon appellee, but the testimony shows a most brutal and unprovoked assault upon him. We will not detail the testimony upon this phase of the case. It is sufficient to say that appellee was fired upon with a pistol, clubbed into insensibility, his person searched, and the contents of his pockets removed. This conduct was accompanied by violent and abusive language. After he was released he was ordered in a most insulting and humiliating manner to leave the yards. In view of these facts and the rules announced in like cases, we are not prepared to hold the damages allowed to be excessive. Railway Company v. Martino, 2 Tex. Civ. App. 634, 18 S. W. 1066, 21 S. W. 781; Railway Company v. Gilbert, 64 Tex. 541.

Affirmed.