ST. LOUIS SOUTHWESTERN RY. CO. OF
TEXAS v. HUDSON et al.	(No. 3178.)*

(Court of Civil Appeals of Texas. Texarkana. June 3, 1926.)

1. Railroads ⚖➪281(1)—Railroad's liability for homicide by state ranger must be established by evidence that responsible representative instigated offense, or that ranger was employee (Pen. Code 1925, arts. 1094–1096, 1099; Rev. St. 1925, arts. 907–910).

Civil liability of railroad, furnished with state rangers during strike, under Open Port Law (Pen. Code 1925, arts. 1094–1096, 1099; Rev. St. 1925, arts. 907–910), for unjustifiable killing of picket by ranger must be established by evidence that responsible railway representative instigated offense, or that ranger was employee of railroad acting in service he was engaged to perform when offense was committed.

2. Railroads ⚖➪282(5)—Evidence held insufficient to show homicide by state ranger furnished during strike was incited by representative of railroad.

In action for death of plaintiffs' son killed by state ranger, furnished to railroad during strike, under Open Port Law (Pen. Code 1925, arts. 1094–1096, 1099; Rev. St. 1925, arts. 907–910), evidence *held* insufficient to show that homicide was incited by any representative of railroad.

3. Railroads ⚖➪281(1).

Even if subordinate of railroad incited state ranger, furnished during strike under Open Port Law, to commit violence, railroad would not be liable for ranger's wrongful acts (Pen. Code 1925, arts. 1094–1096, 1099; Rev. St. 1925, arts. 907–910).

4. Railroads ⚖➪281(1).

Irregularity of appointment of state ranger, furnished railroad during strike, *held* unimportant on question of railroad's liability for homicide by ranger.

5. Master and servant ⚖➪301(1).

Public officer may for certain purposes be servant of private corporation, and his official character furnishes no protection to employer against consequence of unofficial acts done in line of employment.

6. Railroads ⚖➪281(1)—Official position of state ranger furnished railroad during strike held no justification for his killing of picket (Pen. Code 1925, arts. 1094–1096, 1099; Rev. St. 1925, arts. 907–910).

Official position of state ranger, furnished railroad during strike, under Open Port Law (Pen. Code 1925, arts. 1094–1096, 1099; Rev. St. 1925, arts. 907–910), *held* no justification for killing, for ranger's personal motive, of picket who was not committing any offense.

7. Master and servant ⚖➪306.

Master is not liable for every wanton act of servant, but he is responsible to third persons only when servant's misconduct occurs in service he was engaged to perform.

8. Railroads ⚖➪281(1)—Railroad held not liable for wanton homicide by state ranger furnished during strike.

Even if state rangers furnished railroad during strike, under Open Port Law (Pen. Code 1925, arts. 1094–1096, 1099; Rev. St. 1925, arts. 907–910), on condition that railroad pay salaries of rangers, were employees of railroad, railroad would not be liable for ranger's wanton homicide, committed when not engaged in protecting railroad's property or employees.

9. Master and servant ⚖➪302(2)—Servant cannot by mere intention enlarge scope of employment to make master responsible for acts.

Servant may by disobedience or indiscretion, when acting within scope of his employment,

bind master for resulting injuries, but cannot by mere intention enlarge scope of employment and make master responsible for acts which he was not employed to perform; doctrine of "apparent authority" not being applicable to master and servant.

**10. Master and servant ⬦⟼306.**

Violent nature of strike guard would be no basis for employer's liability for homicide resulting from guard's personal wantonness beyond scope of his employment.

**11. Evidence ⬦⟼14.**

Courts may judicially notice that strike by railroad employees is species of industrial warfare to compel concessions from employer, by impairing its ability to continue normal transportation operations.

**12. States ⬦⟼41—Governor held not required to wait until actual obstruction of railroad traffic or violence occurs before issuing proclamation, under Open Port Law (Pen. Code 1925, arts. 1094–1096, 1099; Rev. St. 1925, arts. 907–910).**

Governor is not required to wait until actual obstruction of railroad traffic or violence occurs before issuing proclamation, under Open Port Law (Pen. Code 1925, arts. 1094–1096, 1099; Rev. St. 1925, arts. 907–910), taking over exclusive police supervision of certain territory, and sending state rangers to. guard railroad property during strike.

**13. States ⬦⟼68.**

Railroad employees have legal right to quit work in body and do "picket service," and state ranger has no authority to interfere.

**14. Railroads ⬦⟼281(1).**

That railroad paid salaries of state rangers furnished during strike, under Open Port Law, *held* not to make rangers its employees (Pen. Code 1925, arts. 1094–1096, 1099; Rev. St. 1925, arts. 907–910).

Appeal from District Court, Smith County.

Suit by W. H. Hudson and another against the St. Louis Southwestern Railway Company of Texas. Judgment for plaintiffs, and defendant appeals. Reversed and rendered.

Superseding former opinion in 282 S. W. 257.

Marsh & McIlwaine and Bryan Marsh, all of Tyler, for appellant.

Edwards & Hughes, of Tyler, for appellees.

HODGES, J. On further consideration of this case we have concluded that it was erroneously affirmed. The former opinion will therefore be withdrawn and the following substituted:

In July, 1922, there occurred what is commonly known as the railway shopmen's strike. At that time the appellant owned, at Tyler, Tex., repair shops in which several hundred men had been employed. A large number of those employees joined the strikers. and quit work. Upon the ground that it was appre-

hensive of violence to its remaining employees and interference with its railway operations by the strikers and their sympathizers, appellant, through its attorneys, applied to the Governor of Texas for a body of rangers to act as a guard for its property and employees. The Governor consented to send rangers, provided the appellant would furnish the funds with which to pay their compensation, giving as a reason that no appropriation was available for that purpose. This was agreed to by the appellant's representatives, and, under orders from the Governor and the adjutant general, a number of rangers were assembled at Tyler, under the command of Capt. H. P. Brady.

On or about October 7, L. W. Pearce, one of those holding a commission as a ranger, shot and killed Clayton Hudson, a son of the appellees W. H. and Rosa Hudson. The circumstances showed that the killing was without any justification. Some time later this suit was filed ·by the appellees against the appellant to recover damages resulting from the wrongful killing of their son by Pearce. It was alleged, among other things, that Pearce, while nominally a state ranger, was in fact an employee of the appellant; that he had been selected and armed at the instance of the appellant, was paid for his services by appellant, and was when the killing occurred acting in furtherance of his employment. It was also alleged that Pearce was a violent and dangerous man, unfit for such duties, and that, notwithstanding this was known to the appellant, Pearce was continued in its service.

As a defense the appellant pleaded specially the existence of the strike and its attending disturbances, that for the purpose of protecting its local property from injury and its employees remaining in the service from violent molestation, in order that it might continue its operations as a common carrier, it applied for and secured in a lawful manner a number of state rangers to act as guards to prevent threatened violence. It further alleged that Pearce was one of those legally appointed rangers; that he was subject only to the orders and authority ·of the regularly appointed captain of the ranger force, and was in no sense its private employee, nor was he at the time of the killing performing any service for the railway company. It also averred that the killing of Hudson by Pearce was the result of a private difference between Pearce and Hudson, wholly unconnected with any legal duty which Pearce had engaged to perform for appellant.

The court submitted to the jury the following special issues: (1) Was Pearce an employee of the defendant company on the occasion and at the time Hudson was killed? (2) Was he at that time acting within the scope of his employment? (3) Was the killing of Hudson by Pearce a wrongful act? (4) Was Pearce a person unfit for the service, if

any, he was employed by the defendant to perform? (5) Could the defendant or its officers by the exercise of ordinary care have ascertained before the killing of Hudson that Pearce was a person unfit (if he was unfit) for the service, if any, in which he was employed by the defendant company at the time of the killing? (6) Was such unfitness, if any, a proximate cause of the death of Hudson? (7) Was the appellant, its agents and servants, guilty of negligence in permitting Pearce to be and remain in the service, if he was, at the time of the killing? (8) Was such negligence of defendant, if there was any, a proximate cause of the death of Hudson? All of those questions were answered in the affirmative. In answer to other questions the jury fixed the aggregate damages to the appellees at the sum of $9,500.

The main ground urged for a reversal of the judgment is that the evidence is insufficient to support the findings of the jury in regard to Pearce's employment and· his relations to the appellant. It is insisted that the evidence conclusively showed that Pearce was a public officer, regularly appointed, was acting solely as an officer, was in no way responsible to the appellant for his conduct, and was not under its control in any of the details of the service he was performing or was engaged to perform.

.It is unnecessary to here discuss the police duties of a state ranger, or the authority of the Governor to use the ranger force in the enforcement of the laws of the state. The penal provisions of what is known as the "Open Port Law," adopted in 1920, are as follows:

"Art. 1094. It shall be unlawful for any one by or through the use of any physical violence or by threatening the use of any physical violence, or by intimidation or threatening destruction of his property to interefere with or molest or harass any person or persons engaged in the work of loading or unloading or transporting any commerce within this state.

"Art. 1095. It shall be unlawful for any two or more persons to conspire together to prevent or attempt to prevent, by the use of physical violence or intimidation or by threats of physical violence, or by abusive language spoken or written to any person engaged in loading or unloading or transporting any commerce within this state, any person from performing the duties of such employment.

"Art. 1096. Every person who. shall through any act or written communication or conversation with any person or persons engaged in loading, unloading or transporting any commerce by any common carrier in Texas, or with the father, mother, wife, sister, brother, child or children of such person or persons while so engaged,. or during the hours or day or night while not engaged in such work and when employed for such work, which is reasonably calculated, intended or designed to cause such person or persons so engaged to desist from performing such work through fear of physical violence or destruction of his property, shall be deemed to have intimidated, molested or har-

assed such person or persons engaged in the work of loading or unloading or transporting commerce within this state.

"Art. 1099. Any person violating any provision of this chapter shall be fined not less than one hundred nor more than one thousand dollars, or be imprisoned in jail not less than thirty days nor more than one year, or both. Should any person violating any provision of this chapter use any physical violence upon, or threaten ·the life of any person engaged in the work or loading or unloading, or transporting any commerce, as defined in this chapter, he shall be confined in the penitentiary not less than one nor more than five years.".

The above references are to the revision of 1925. Other appropriate provisions of the act are found in the Revised Civil Statutes of 1925, appearing as articles 907 to 910, inclusive. Article 907 is as follows:

"If at any time the movement of commerce by common carriers of this state or any of them is interfered with, in violation of the provisions of chapter 10, title 14 of the Penal Code, and the Governor, after investigation, becomes convinced that the local authorities·were failing to enforce the law, either because they were unable or unwilling to do so, the Governor shall, in order that the movement of commerce may not be interfered with, forthwith issue his proclamation declaring such conditions to exist and describing the area thus affected."

Article 908 provides that, upon the issuance of the proclamation, the Governor shall exercise full and complete police jurisdiction over the area described in his proclamation, and such police jurisdiction shall supersede the police powers of the local authorities, provided that the Governor shall not disturb the local officers in the exercise of police jurisdiction outside of the designated territory. Article 910 authorizes the Governor to use the state rangers in the enforcement of the provisions of the law. It further provides that if a sufficient number of rangers is not available the Governor is authorized to employ others for that purpose, and that such other persons shall have all the powers and authority of the regular rangers and shall be paid the same salary as rangers out of the appropriations made to the executive office for the payment of rewards and the enforcement of the law.

The adjutant general testified by deposition that, under his direction Capt. H. P. Brady, a member of the state ranger force, was ordered to Tyler to take command of the rangers assembled there during the strike of 1922. His orders to Brady were to protect property from destruction, workmen from injury, and to keep the peace. He further stated, in substance, that Brady was authorized to enlist and discharge men as members of this special ranger force. Acting under that authority, Brady assembled a force of about 30 men, to whom commissions were issued and over whom he assumed command. Among those

enlisted was Pearce, the man who committed the homicide.

At the time he was killed, Hudson and a companion were doing what is called "picket duty" at a point where Pabst street in the city of Tyler crosses the International & Great Northern Railway right of way, and several feet from the appellant's property. An eyewitness to the killing testified, in substance, that he was in the inspector's shanty, at the International & Great Northern Railway track, about 20 or 25 feet from the main line of the International & Great Northern Railway, at a point where Pabst street crosses the railway. On the west side of the shanty were two big windows, and on one of them was written in big letters, "Scabs wanted." Pearce passed by and saw that writing, and walked up to where Hudson and another one of the pickets were sitting or standing. Hudson was at the time squatting down on the ground. The first thing Pearce said was: "Which one of you G—— d—— sons of b—— put that sign on that window?" And he pointed to the sign. Hudson said, "We didn't do it," or "I don't know." Pearce then walked over to where Hudson was and said to him: "G—— d—— you, didn't I tell you to keep off of here and quit meddling around here with the company's business? I told you I was going to kill you"—and pulled out his six-shooter, fired, and Hudson fell over and expired almost immediately.

[1] In order to establish the civil liability of the appellant for this apparently unjustifiable killing, it must be shown by legal evidence that it was committed at the instance of some responsible railway representative, or that Pearce was an employee of the appellant, and that the offense was committed while acting in furtherance of some service he was engaged to perform.

[2] The testimony admitted covered a wide range and included some details which might properly have been excluded. But it fails to furnish a legal basis for a fair inference that the homicide was directly or indirectly incited by any representative of the appellant. There was testimony that Pearce had been often seen in consultation with some of the railway officials and subordinate employees. But no witness testified as to any directions or suggestions made by those officials or employees that would tend to encourage or induce Pearce to commit this or any other act of violence against those engaged in doing picket service for the strikers. One of the special rangers, a witness for the appellees, testified, in part, as follows:

"I did not, while engaged in the service before the death of Hudson, receive any special instructions from the defendant or any of its officers or agents or special agents or deputy special agents as to my conduct towards the striking employees of the defendant or their pickets, or to any person, or persons who might be on or near the railway property without being an employee of the defendant company. But

286 S.W.—49

it was generally understood that we were to handle them very roughly."

This last sentence might justify an inference that when the pickets were interfering with the workmen they were to be handled *very roughly*, but it does not warrant the conclusion that the rangers had been directed by any representative of the appellant to do any act of violence to those known as pickets, or in any way molest those of the strikers who were quietly and peacefully occupying places where the pickets were usually posted. What is here said by the witness was manifestly his conclusion, and not the statement of a fact.

S. M. Patterson, who was in command of the special rangers during the absence of Capt. Brady, testified that the service he and other rangers were to perform was to protect the property and employees of the railway company. He stated that if the rangers performed any other service for the railway company except to guard its property from trespass and intrusion, and its employees from interference, he knew nothing of it. When asked if the rangers had not been asked to stop interference by pickets, he said:

"I will say the picket line was harassing or annoying shop employees more or less at this time, and it was our duty to prevent imposition on employees by the picket line. I never received or gave any orders to attempt to break up this picket line. I do not know, to my knowledge, of any wish expressed from the Cotton Belt officials to the effect that we break up this picket line. * * * I will say it is my recollection that the elimination of the picket line was discussed between the railway officials and the ranger in charge, as it had a tendency to intimidate men who might apply for employment. My recollection is that Brady advised that this could not be broken up legally, and that he could not give any relief to breaking up the picket line."

Again he said:

"These meetings would consist of rangers and employees and officials, ranging from janitors to the general manager. * * * Different things would come up on which we would need advice or information, and it was our idea to prevent friction, and the gist of these meetings was to get the basis of what action to take to prevent friction."

When asked concerning the duties of Pearce and other rangers, he said:

"After he was appointed ranger it was his duty to see that the day rangers were functioning properly and executing their duties; he was termed 'day corporal,' and had charge of the day shift of special rangers on the Cotton Belt property. He was supposed to circulate over the grounds in general, and prior to 7 a. m. was to station himself at the passenger depot in order to prevent employees being molested or annoyed; he was also to station himself at this place at noon and remain there until 1 o'clock, and at 5 p. m., or quitting time, and remain there as long as practicable for the same purpose."

When asked concerning the authority of Pearce, he said:

"All I can say is that Pearce was not bound to take orders from or obey the wishes of Cotton Belt officials. I do not know of any agent or official of the defendant company who had the authority to issue orders or instructions to Pearce. To my recollection, not having ever heard any official, agent, or employee of the Cotton Belt give Pearce any orders, I do not know of any duties he had to perform under their direction."

McKinney, another member of the ranger force, testified:

"I was employed to do guard duty for the Cotton Belt at Tyler and to protect the railroad property, keep the trespassers and intruders off of the property, and protect their working men; and I performed this service at the Cotton Belt Railroad shops in Tyler, Tex., and all of my work was on the south side of the yard. * * * The said rangers or special rangers were stationed or posted at intervals on 'posts' or 'beats' in and through the shop yards. These posts or beats were established when I went there, and I do not know who they were established by. I do not know who designed the place or places where they should be stationed to keep intruders off the defendant's premises or property, both in the daytime and also the night, before the death of Hudson."

It appears from other testimony that appellant's shops were situated within an enclosure in which there were openings, or gates, through which the workmen, and others having business on the premises, passed. Guards were placed at these openings, with instructions to permit no one to enter except those presenting a pass from the superintendent of motive power. This was done in order to prevent the intrusion of any one for the purpose of injuring property or interfering with those at work in the shops. The guarding referred to in the testimony quoted was around the property situated within that enclosure. Doubtless, much of what passed during the conferences between the appellant's officers and subordinate employees and the special rangers related principally to the distribution of those guards, and their duties.

[3] Pearce, it seems, was not himself assigned to guard duty. He was to place the guards, and probably see that they did their duty, and to escort employees to and from trains. Among those with whom he was associated were Holbert, a special agent, Kammerlin, the private secretary of Peasley, the superintendent of motive power, and some others doing guard duty. None of these, except Peasley, is shown to have had any authority to represent the appellant in giving directions or instructions to the rangers regarding the character of their service. There is no evidence that Peasley gave any directions to any of the members of the ranger force; he testified that he did not attempt any form of control. Even if some subordinate did incite or encourage Pearce to violence against the pickets, that would not make the railway company liable for the wrongful acts of Pearce.

[4, 5] The next question is, can the appellant be held liable on the ground that Pearce was its employee? In determining that question we shall treat as unimportant whatever irregularity there may have been in the appointment of Pearce as a member of the ranger force. If his appointment was invalid, the fault was not that of the appellant, but of Brady and his official superiors. The appellant had nothing to do with the selection of Pearce or the issuance of his commission. It had a right to assume, and doubtless did assume, that the appointment was legally made, and that Pearce was a de jure public officer. There is nothing in the evidence to show that it had notice of any irregularity. On the other hand, even if Pearce were an officer de jure, that fact would not, under all conditions, be decisive of the question here involved. A public officer may, for certain purposes, be the servant of a private corporation; and when such the official character of the servant furnishes no protection to his employer against the consequences of unofficial acts done in the line of employment. T. & N. O. Ry. Co. v. Parsons, 102 Tex. 157, 113 S. W. 914, 132 Am. St. Rep. 857; Lancaster v. Carter (Tex. Com. App.) 255 S. W. 392.

[6] The circumstances under which the killing occurred show that Pearce was not then acting in his official capacity. Hudson had not committed any offense against the laws of the state, and Pearce was not attempting to make an arrest. The assault was apparently unprovoked, and prompted solely by some motive personal to Pearce. The official position of Pearce would, therefore, furnish no legal justification for the act.

For the purpose of further discussion we shall assume that Pearce was, in a sense, an employee of the appellant—that he and his associates had been engaged to render services for its private benefit.

[7] The doctrine of respondeat superior rests upon some form of contract of personal employment, express or implied. The master cannot be made civilly liable for every wanton act of the servant. The limitations are supplied by the contract of employment, and the master is responsible to third parties only when the misconduct of the servant occurs in the service he had been engaged to perform. 39 C. J. p. 1279. It then becomes necessary to inquire into the character of service which Pearce had been employed to render for the railway company. The appellees' own witnesses stated repeatedly that the rangers were engaged to protect the appellant's property from trespass and injury and their employees from interference.

[8] The assault on Hudson was not committed in an effort to protect the railway property. There is not the slightest evidence that Hudson was attempting any trespass or

injury, or that there was any occasion for apprehending that he might commit such an offense. It is equally clear that Hudson when shot was not interfering with any of the railway employees. The picket service instituted by the strikers contemplated only the use of moral suasion with those who appeared to be seeking employment with the railway company. Picketing did not, according to the evidence, go so far as to include any form of molestation of those who were actually in the railway service. If Pearce committed the unlawful act when not engaged in protecting either the property or the employees of the appellant, it cannot be said that he was acting in furtherance of the service he was engaged to perform; and therefore the appellant, even if his employer, cannot be held liable.

[9] The fact that Pearce may have intended the act for the benefit of the railway company, or thought he was acting in its interest, cannot have the legal effect of extending the limits of his master's responsibility. The servant may, by his disobedience, or indiscretion, when acting within the scope of his employment, bind the master for resulting injuries; but the servant cannot by mere intention enlarge the scope of his employment and make the master responsible for conduct occurring at a time when the servant is doing what he was not employed to perform. The doctrine of "apparent authority" applies to the relation of principal and agent, not to that of master and servant.

The inference is that Pearce assaulted Hudson in an effort to destroy the business of picketing by the strikers, or because he was angered by the writing on the window. There is no evidence that he was employed for that purpose, or that it was contemplated by the appellant, or the commanding ranger, that such would be undertaken. On the contrary, the evidence shows that when that subject was discussed Capt. Brady advised that breaking up picketing could not be done legally. That was sufficient to exclude the molestation of the pickets from any contemplated service the rangers were to perform, either for the state or the appellant. The reckless character and violent nature attributed to Pearce by the averments of the appellees, and the testimony of some of their witnesses, if true, supply the real reason for this wanton interference with men engaged in a peaceful employment.

[10] It is insisted that the appellant may be held liable on the ground that Pearce was a dangerous and violent man and that the appellant was guilty of negligence in retaining him in its service. If the killing had occurred while Pearce was performing a service he had been employed to render, that proposition might be properly invoked. But the appellant did not by hiring him make Pearce a violent and dangerous man, and could not control his conduct outside the scope of his

employment. If the killing was the result of personal wantonness, entirely beyond the service Pearce had been engaged to render, his unsavory character cannot be made the basis of liability of his employer.

Thus far we have discussed the question of liability upon the assumption that the relation of master and servant existed between the appellant and Pearce. But does the evidence require that concession? The facts relied on to show that relationship are: (1) That Pearce was performing a private service for the appellant in guarding its property and employees; and (2) that his compensation was paid by the appellant.

In determining the nature of the service which Pearce and the other special rangers were performing—that is, whether it was official or unofficial—we must take into consideration the fact that the appellant is a common carrier, and not strictly a private corporation organized and operated for the sole benefit of its stockholders. Its line of railroad is a public highway, over which a large portion of the commerce of the country is carried. Every important business enterprise in the state is organized and conducted in reliance upon the unobstructed and normal operation of such highways. The cessation of railway transportation from any cause for any considerable length of time, or any appreciable impairment of its service, inevitably results in a public injury. It was to prevent such consequences that what is known as the "Open Port Law" was enacted. In its caption that law (Acts 4th Called Sess. 1920, c. 5) is designated as "An act to protect and facilitate the movement of commerce by common carriers." The following appears as a statement of the emergency, calling for its immediate passage:

"The great importance of the expeditious transportation of commerce of this state and the unrestricted movement thereof by the common carriers of this state and the dependence of the people of this state upon such movement of commerce," etc. Section 18.

[11] The courts may take judicial notice of the fact that a strike by employees of a railway company is a species of industrial warfare designed to compel concessions from the employer by impairing its ability to continue normal transportation operations. That violence against both the property and employees of the railway company frequently occurs as an incident to such strikes is a part of the industrial history of the country. The evidence in this case shows that only a short time before the rangers were assembled at Tyler, two employees in the service of the International & Great Northern Railway Company at that place were assaulted, and one of them was killed, because they were working for that company. During the strike of 1922, a representative of the adjutant general's department visited Tyler, inspected the ranger force, and looked over the situation. About a week

after Hudson was killed the Governor issued his proclamation, authorized by the "Open Port Law," and took over the exclusive police supervision of certain local territory at that place.

[12] In the absence of any evidence to the contrary, it may be assumed that in issuing his proclamation, and in previously ordering rangers sent to Tyler, the Governor was within his legal authority, and that the conditions existed which called for such official action. He was not required to wait until an actual obstruction of traffic or deeds of violence occurred before furnishing proper lawful protection. In doing this he invaded no private right and interfered with no personal privilege of those arrayed against the railway company. No person, except one desiring to engage in some unlawful form of interference with railway transportation or operation, had any occasion to complain of what the Governor did, or of the conduct of the appellant in applying for such guards.

[13] The employees of the railway companies had a legal right to quit work in a body, as they did, and were still within their rights in doing what is called "picket service," and with such rights Pearce had no authority, from any source, to interfere. The killing of Hudson was done in the prosecution of a design purely personal to Pearce. To treat the state rangers, while doing legitimate guard duty, as the private employees of the railway company, would impose a legal responsibility which no common carrier should be required to assume when invoking the protection of the law. The public, as well as the carrier, is interested in keeping open the channels of commerce; and the public may suffer when the steps needed to that end are discouraged by the imposition of financial risks which prudent business men might hesitate to incur.

[14] The next question is, Does the fact that the appellant paid the compensation of Pearce and other rangers make them its private employees and establish the relation of master and servant? We are of the opinion that it did not. Appellant did not undertake to hire rangers as guards. It applied for them in a legitimate way, at the state's expense, and solely for the purpose of securing official protection. The evidence about which there is no dispute makes it clear that appellant agreed to supply the needed funds only because the state had none available for that purpose. It was confronted with a situation where it must either pay the compensation of the rangers for that service, or do without the protection which the law entitled it to claim. Appellant did not select the men or attempt to exercise any control over them. The captain of the force was in command, and he alone had authority to direct and control the rangers. He and his superiors alone had the right to discharge Pearce from the service. It is true the appellant might have withheld such portion of the compensation as went to Pearce; but that act would not have affected the official status of Pearce as a member of the ranger force, or in any way lessened his authority to continue the performance of his official duties. It may be said that the appellant might have objected to the presence of Pearce upon its premises. But the failure to object could not transform a public officer into a private employee. As previously stated, Pearce had been selected by Brady. His commission was by Brady transmitted to and filed in the office of the adjutant general. The selection of Pearce was therefore known to that department; and the appointment, if not made by the Governor, or the adjutant general, was later acquiesced in by them. He was recognized and treated as a legally appointed member of the force. Whatever irregularity there may have been in the appointment was due to the conduct of the adjutant general's department, and not to the appellant.

Aldrich, the acting assistant adjutant general, testified that payment by the railway companies was the usual method of securing funds for compensating the rangers while acting as guards during the strike of 1922. This was due to the lack of any appropriation by the state. If the entire force stationed at Tyler had been regularly commissioned and paid by the state, as was Brady, the captain, it could not be contended that because the appellant allowed them to occupy its premises while acting as guards, they thereby became its private employees.

We therefore conclude that under the evidence Pearce must be treated as a public officer, and not as the servant of the appellant. We think the following cases support that conclusion: Tucker v. Erie Ry. Co., 69 N. J. Law, 19, 54 A. 557; Healey v. Lothrop, 171 Mass. 263, 50 N. E. 540; Grubb v. G. H. & S. A. Ry. Co. (Tex. Civ. App.) 153 S. W. 694; Pounds v. Central Ry. Co., 142 Ga. 415, 83 S. E. 96, 10 Neg. Com. Cases Ann. 295. In the case of Railway Co. v. Parsons, previously cited, Judge Brown used the following language:

"We do not mean to say that an officer may not watch property to prevent threatened injury."

Because of the insufficiency of the evidence to support a finding of liability against the appellant for the damages resulting from the unlawful act of Pearce, the judgment of the trial court will be reversed, and judgment here entered for the appellant.